UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN DOE, AMERICAN CIVIL LIBERTIES
UNION, and AMERICAN CIVIL LIBERTIES
UNION FOUNDATION,

                              Plaintiffs,

             — against —

ALBERTO GONZALES, in his official
capacity as Attorney General of the
United States; ROBERT MUELLER, in his
official capacity as Director of the
Federal Bureau of Investigation; and
VALERIE E. CAPRONI, in her official
capacity as General Counsel to the
Federal Bureau of Investigation,

                              Defendants.

04 Civ. 2614 (VM)

**OPINION**
**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

**TABLE OF CONTENTS**

PAGE

I.  _INTRODUCTION ....................................... 1

II. BACKGROUND ......................................... 4

     A.  SECTION 2709 .................................. 4

     B.  DOE I ......................................... 6

     C.  THE REVISED NONDISCLOSURE PROVISION ........... 8

     D.  THE FBI'S USE OF NSLs ......................... 11

     E.  PLACING NSLs ISSUED UNDER § 2709 IN CONTEXT ... 16

          1.  Administrative Subpoenas ................. 16

          2.  Pen Registers, Wiretaps, and Foreign
              Intelligence Surveillance ................ 17

          3.  Secrecy in Grand Jury Proceedings ........ 21

-i-

III. DISCUSSION ........................................ 23

    A.    STANDARD OF REVIEW ........................... 27

    B.    STANDING ..................................... 27

    C.    STRICT SCRUTINY .............................. 28

    D.    PROCEDURAL SAFEGUARDS ........................ 35

          1.    The Freedman Safeguards ................ 35

          2.    Application of Freedman ................ 39

          3.    The NSL Statute Fails to Satisfy Freedman. 51

    E.    DISCRETION ................................... 53

    F.    PRESCRIBING THE STANDARD OF JUDICIAL REVIEW ... 60

          1.    Congress Cannot Legislate a Standard of
                Review at Odds with First Amendment
                Jurisprudence .......................... 61

                a.    Historical Context of Checks and
                      Balances and Separation of Powers ... 61

                b.    Application of the Principles
                      Separation of Powers ............... 65

                c.    Prospective Concerns ............... 71

          2.    The Review Prescribed by § 3511(b) Does
                Not Comport with First Amendment
                Jurisprudence .......................... 78

    G.    NARROW TAILORING ............................. 87

    H.    SCOPE OF 18 U.S.C. §§ 3511(d) AND 3511(e) ..... 93

          1.    Closure of Hearings and Sealing of
                Records ................................ 94

          2.    Consideration of Ex Parte and In
                Camera Evidence ........................ 96

    I.    SEVERANCE .................................... 99

**IV.   CONCLUSION** ........................................101

**V.    STAY OF JUDGMENT** ..................................101

**VI.   ORDER** ............................................102

## I.  <u>INTRODUCTION</u>

Plaintiffs John Doe, American Civil Liberties Union, and American Civil Liberties Union Foundation (collectively, "Plaintiffs") initially brought this case in 2004, challenging the constitutionality of 18 U.S.C. § 2709, <u>amended</u> <u>by</u> the USA Patriot Act (the "Patriot Act"), Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001) ("§ 2709").  Section 2709 was originally enacted as part of Title II of the Electronic Communication Privacy Act of 1986 ("ECPA"), Pub. L. No. 99-508, § 201, 100 Stat. 1848, 1867-68 (1986), and governs the issuance of National Security Letters ("NSLs") by the Federal Bureau of Investigation ("FBI") to wire and electronic communication service providers ("ECSPs").  This Court, in a lengthy decision dated September 28, 2004, granted Plaintiffs' motion for summary judgment and declared § 2709 unconstitutional on its face, under the First and Fourth Amendments.  <u>See</u> <u>Doe v. Aschroft</u>, 334 F. Supp. 2d 471 (S.D.N.Y. 2004) ("<u>Doe  I</u>").  "Considering the implications of its ruling and the importance of the issues involved," the Court stayed enforcement of its judgment pending appeal.  <u>See</u> <u>id.</u> at 526.

Shortly after this Court's decision, a court in the District of Connecticut enjoined the Government from enforcing the nondisclosure requirement of § 2709(c) insofar as it prevented the plaintiff in that case from revealing its

identity as a recipient of an NSL, holding that § 2709(c) failed to satisfy strict scrutiny because it was not narrowly tailored to serve a compelling state interest. See Doe v. Gonzales, 386 F. Supp. 2d 66, 82 (D. Conn. 2005) ("Doe II").

While appeals in Doe I and Doe II were pending, Congress passed the USA Patriot Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 192 (Mar. 9, 2006) (the "Reauthorization Act."). The Reauthorization Act effectuated substantial changes to § 2709 and added several provisions relating to judicial review of NSLs which were codified at 18 U.S.C. § 3511 ("§ 3511").[1] As a result of these amendments, the Second Circuit remanded the Doe I appeal to enable this Court, if the parties were to continue the litigation in light of the amendments to the statute, to consider the validity of the revised § 2709(c) and the new procedures codified in § 3511. See Doe v. Gonzales, 449 F.3d 415, 419 (2d Cir. 2006).[2]

Plaintiffs filed a second amended complaint and have

---

[1] Congress made further changes to § 2709(c) in the USA Patriot Act Additional Reauthorizing Amendments Act of 2006, Pub. L. No. 109-178, 120 Stat. 278 (March 9, 2006). Specifically, this act amended § 2709(c)(4), which requires NSL recipients to inform the FBI of anyone to whom they disclosed having received the NSL, with the exception of counsel, and it added § 2709(f), which excludes libraries from the definition of wire or electronic communications service providers.

[2] The Second Circuit decision was a consolidated appeal of this Court's decision and Doe II. Because the Government indicated on appeal that in light of the Reauthorization Act, it would not oppose disclosure of plaintiff's identity as an NSL recipient in Doe II, the Second Circuit dismissed Doe II on mootness grounds. See Doe v. Gonzales, 449 F.3d at 421.

moved for summary judgment,[3] seeking a declaratory judgment that the amended nondisclosure provision of § 2709(c) and § 3511(b) are unconstitutional on their face and as applied under the First Amendment and the principle of separation of powers, and that § 3511(d) and (e) are unconstitutional on their face under the First and Fifth Amendments.   Defendants Alberto Gonzales, Robert Mueller, and Valerie E. Caproni[4] (collectively, the "Government") have cross-moved for dismissal of the complaint or, in the alternative, summary judgment.   Having reviewed the briefs submitted by the parties, as well as the briefs submitted by amicus curiae in support of Plaintiffs' motion,[5] and having heard oral

---

[3]   Plaintiffs framed their present motion as one for partial summary judgment, seeking a ruling that the nondisclosure provisions of § 2709(c) and the secrecy provisions of § 3511 are unconstitutional on their face and as applied.   Separately, Plaintiffs also seek to set aside the demand for records issued to John Doe pursuant to 18 U.S.C. § 3511(a).   (See Petition to Set Aside Demand for Records, dated September 8, 2006.) The Government, however, has indicated it no longer seeks to enforce the underlying NSL.   (See Declaration of Jeffrey Oestericher ("Oestericher Decl."), dated Nov. 7, 2006, ¶ 3.) Thus, it appears to the Court that resolution of the instant motions fully dispose of the case.

[4] Pursuant to Fed. R. Civ. P. 25(d)(1), although Marion Bowman is the party named in the complaint in her official capacity as FBI Senior Counsel, because she has retired and been replaced by Valerie Caproni, General Counsel to the FBI, "the officer's successor is automatically substituted as a party."   (See Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment and in Support of the Government's Motion to Dismiss or for Summary Judgment ("Gov't Opp."), dated November 8, 2006, at 1 n.1.)

[5] See Memorandum of Law of Amicus Curiae The Association of the Bar of the City of New York in Support of Plaintiffs' Motion for Partial Summary Judgment ("ABCNY Amicus Brief"), dated September 29, 2006; Brief of Amici Curiae American Library Association, American Booksellers Foundation for Free Expression, American Association of Publishers, Inc., Freedom to Read Foundation and Pen American Center in Support of Plaintiffs' Motion for Partial Summary Judgment and to Set Aside Demand for Records ("Libraries, Bookstores, Publishers and Writers Amici Brief"), dated September 29,

arguments, the Court finds that several aspects of the revised nondisclosure provision of the NSL statute violate the First Amendment and the principle of separation of powers. The Court therefore holds that §§ 2709(c) and 3511(b) are facially unconstitutional. However, the statutory provisions governing hearings, proceedings, and judicial review of evidence related to a challenge to an NSL, §§ 3511(d) and (e) respectively, are constitutional. Accordingly, Plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part, and the Government's cross-motion for dismissal or summary judgment is DENIED.

## II.   BACKGROUND

A.   SECTION 2709

The FBI is authorized by § 2709 to issue NSLs requesting a range of information about an ECSP's subscribers and their telephone or internet activity. Section 2709(a) states that an ECSP "shall comply" with a request for "subscriber information and toll billing records information, or electronic communication transactional records" made by the FBI. 18 U.S.C. § 2709(a). Section 2709(b) requires that, in order for the FBI to request "the name, address, length of service, and local and long distance toll billing records" of a person or entity, the Director of the FBI, or his designee,

---

2006.

must certify that such information is "relevant to an authorized investigation to protect against international terrorism or clandestine intelligence activities."[6] 18 U.S.C. § 2709(b).

As the Court noted in Doe I, "the statute's reference to 'transactional records' creates ambiguity regarding the scope of the information required to be produced by the NSL recipient." 334 F. Supp. 2d at 507. That ambiguity is compounded because the NSL directs the recipient to determine for itself whether any information it maintains regarding the target of the NSL "may be considered ... to be an electronic communication transaction record" in accordance with § 2709, but not "contents" of communications within the meaning of 18 U.S.C. § 2510(8).[7] Such information might include the "to," "from," "date," and "time" fields of all emails sent or received, activity logs indicating dates and times that the target accessed the internet, the contents of queries made to search engines, and histories of websites visited. See generally Jonathan Zittrain, Searches and Seizures in a Networked World, 119 Harv. L. Rev. F. 83 (2005). Information requested by NSLs issued pursuant to § 2709 can also reveal

---

[6] Section 2709(b) does not make clear whether any certification by the FBI is required with respect to a request for "electronic communication transactional records."

[7] 18 U.S.C. § 2510(8) defines "contents" as "any information concerning the substance, purport, or meaning" of a communication.

the identity of an internet user associated with a certain email address, Internet Protocol address,[8] or screen name.

B.   DOE I

Although familiarity with the Court's decision in Doe I is presumed, a brief review of that decision is useful in order to emphasize the conclusions the Court previously reached in this action, as well as to put in proper context the deficiencies in the prior version of § 2709 that Congress attempted to remedy in enacting the substantial revisions embodied in the Reauthorization Act.

Prior to the Reauthorization Act, as read by this Court, § 2709(c)[9] prohibited "the NSL recipient, or its officers, employees, or agents, from revealing the existence of an NSL inquiry the FBI pursued under § 2709 in every case, to any person, in perpetuity, with no vehicle for the ban to be lifted from the recipient or other person affected, under any circumstances, either by the FBI itself, or pursuant to judicial process."   Doe I, 334 F. Supp. 2d at 476. Consequently, the Court concluded that § 2709 "violate[d] the Fourth Amendment because, at least as applied, it effectively

---

[8] An Internet Protocol address, or "IP address," is a unique number corresponding to a particular computer accessing the internet.

[9] Prior to the Reauthorization Act, § 2709(c) read in full: "No wire or electronic communication service provider, or officer, employee, or agent thereof, shall disclose to any person that the Federal Bureau of Investigation has sought or obtained access to information or records under this section." 18 U.S.C. § 2709(c) (2004).

bar[red] or substantially deter[red] any judicial challenge to the propriety of an NSL request." Id. at 475. Moreover, § 2709's "all-inclusive sweep" failed to "pass muster under the exacting First Amendment standards" the Court found to be applicable. Id. at 476.

The Court concluded that § 2709(c) was a prior restraint, reasoning that "axiomatically the categorical nondisclosure mandate embodied in § 2709(c) functions as a prior restraint because of the straightforward observation that it prohibits speech before it occurs." Id. at 511-12; see also Doe II, 386 F. Supp. 2d at 73 ("Section 2709(c) unquestionably prohibits speech in advance of it having occurred."). Moreover, the Court held that § 2709(c) was a content-based restriction on speech in that it "prohibits any discussion of the first-hand experiences of NSL recipients" and thus closes off "that 'entire topic' from public discourse." Doe I, 334 F. Supp. 2d at 513 (citations omitted). As a prior restraint and a content-based restriction on speech, the provision was subject to strict scrutiny.

The Court pointed out that there likely existed less restrictive alternatives available to the government that would be as effective in achieving the purpose of the NSL statute. See id. at 520-21. The Court went on to acknowledge that while the blanket prohibition against disclosure in §

-7-

2709(c) could not be justified, "the Government should be accorded a due measure of deference when it asserts that secrecy is necessary for national security purposes in a <u>particular</u> <u>situation</u> involving <u>particular</u> <u>persons</u> at a <u>particular</u> <u>time</u>." <u>Id.</u> at 524 (emphasis in original).

The Court held that the nondisclosure provision of § 2709 was unconstitutional on its face, and because the Court could not sever § 2709(c) from the remainder of the statute, the Court enjoined the government from using § 2709 in any case as a means of gathering information.  <u>Id.</u> at 525-26.

C.   <u>THE REVISED NONDISCLOSURE PROVISION</u>

As indicated above, while the Government's appeals were pending before the Second Circuit, Congress enacted the Reauthorization Act.  The Government contends that the revised § 2709(c) and the newly enacted § 3511 directly addresses the concerns raised by this Court in its <u>Doe I</u> decision and rectifies any constitutional deficiencies.  Instead of a categorical, blanket prohibition on disclosure with respect to the issuance of any NSL, § 2709(c) now calls for a case-by-case determination of the need for a nondisclosure order to accompany an NSL.  Specifically, the statute provides that a recipient of an NSL is barred from disclosing that the FBI "has sought or obtained access to information or records" under the NSL statute if the Director of the FBI, or his

-8-

designee, "certifies" that disclosure "may result" in "a danger to the national security of the United States, interference with a criminal, counterterrorism, or counterintelligence investigation, interference with diplomatic relations, or danger to the life or physical safety of any person" (here collectively referred to as the "Enumerated Harms").  18 U.S.C. § 2709(c)(1).

The newly enacted § 3511 provides an opportunity for judicial review of NSLs.  Section 3511(a) explicitly allows the recipient of an NSL to petition a United States district court "for an order modifying or setting aside the request," which the court "may" grant "if compliance would be unreasonable, oppressive, or otherwise unlawful."  18 U.S.C. § 3511(a).  Additionally, under § 3511(b), an NSL recipient may seek an order modifying or setting aside a nondisclosure requirement.

If a petition to modify or set aside the nondisclosure requirement is filed within one year of the NSL request, the reviewing court may grant such relief only if it finds that "there is no reason to believe" disclosure "may result" in one or more of the Enumerated Harms.  18 U.S.C. § 3511(b)(2).  Moreover, if one of several authorized senior FBI officials "certifies that disclosure may endanger the national security of the United States or interfere with diplomatic relations,

such certification shall be treated as conclusive unless the court finds that the certification was made in bad faith." Id.

If the petition to modify or set aside the nondisclosure requirement is filed one year or more after the NSL request was issued, the FBI must either terminate the nondisclosure requirement or re-certify that disclosure may result in one of the Enumerated Harms, in which case the court could grant the petition only in accordance with the standards described above.  See 18 U.S.C. § 3511(b)(3).  Additionally, if the court denies the petition, the NSL recipient is precluded from filing another petition for one year.  See id.

As § 3511 now explicitly permits challenges to NSLs, Plaintiffs do not renew their Fourth Amendment challenge. However, Plaintiffs contend that the amendments do not cure the statute's First Amendment deficiencies, and that it remains an unconstitutional prior restraint and a content-based restriction on speech because it (1) fails to provide constitutionally mandated procedural safeguards, (2) invests the FBI with unbridled discretion to suppress speech, (3) forecloses reviewing courts from applying a constitutionally mandated standard of review, and (4) authorizes the issuance of nondisclosure orders that are not narrowly tailored.

As the Second Circuit vacated this Court's prior decision in light of the Reauthorization Act, the Court must now

-10-

consider whether the nondisclosure provision, with the judicial review now contemplated, still runs afoul of the First Amendment.  For the reasons set forth below, the Court finds that it does.

D.   <u>THE FBI'S USE OF NSLs</u>

<u>Doe I</u> detailed the history of NSLs and the revisions embodied in the Patriot Act which expanded their usefulness as an investigatory tool.  <u>See</u> 334 F. Supp. 2d 480-85.  The Patriot Act expanded the government's authority to use NSLs under the four existing NSL statutes[10] and created a fifth category of NSLs.[11]  However, at the time that <u>Doe I</u> was decided, little was publicly known about how NSLs were being used by the FBI under the new relaxed standards required for issuance after the Patriot Act.

As part of the Reauthorization Act, Congress directed the Department of Justice, Office of the Inspector General ("OIG"), to review the "effectiveness and use, including any improper or illegal use, or national security letters issued

_____

[10] In addition to § 2709, which expanded the use of NSLs under the ECPA, the USA Patriot Act amended: Section 1114(a)(5) of the Right to Financial Privacy Act, 12 U.S.C. § 3414(a)(5) (permits FBI to obtain financial records); Section 626 of the Fair Credit Reporting Act, 15 U.S.C. § 1681u (permits FBI and certain other agencies to obtain a limited amount of information about an individual's credit history); Section 802 of the National Security Act, 50 U.S.C. § 436 (allows FBI to request information related to investigation of improper disclosure of classified information).

[11] Section 627 of the Fair Credit Reporting Act, 15 U.S.C. § 1681v, allows the FBI to obtain full credit reports and all other consumer information in a consumer reporting agency's files.

by the Department of Justice." <u>See</u> Pub. L. No. 109-177, §
119.  In March, 2007, the OIG issued its first public report
pursuant to this statute, entitled "A Review of the Federal
Bureau of Investigation's Use of National Security Letters"
(the "OIG Report").[12]  The OIG Report addresses the FBI's use
of NSLs for calendar years 2003 through 2005.

The OIG Report confirms that the Patriot Act transformed
NSLs into a much more frequently employed investigatory tool.
Specifically, it states that "the FBI issued approximately
8,500 NSL requests in CY 2000, the year prior to passage of
the Patriot Act.  After the Patriot Act, according to FBI
data, the number of NSL requests increased to approximately
39,000 in 2003, approximately 56,000 in 2004, and
approximately 47,000 in 2005."[13]  (OIG Report 120.)  While the
number of NSL requests issued under each separate NSL
provision is not publicly available, the report does indicate
that "the overwhelming majority of the NSL requests sought
telephone toll billing records information, subscriber
information (telephone or e-mail), or electronic communication
transactional records" under § 2709.  (<u>Id.</u> 36-37.)  In

_____

[12] By letter dated March 26, 2007, Plaintiffs sumbitted the OIG Report for
the Court's consideration.

[13]  The OIG Report notes, however, that the total number of NSL requests
were under-reported by the FBI.  The OIG estimated that "approximately
8,850 NSL requests, or 6 percent of NSL requests issued by the FBI during
this period, were missing from the database."  (OIG Report 34.)

considering these statistics, it is important to distinguish between "NSLs" and "NSL requests" -- a single NSL may contain multiple requests for information.  (See id. 120.)  The OIG Report specifies that "the 39,000 NSL requests in 2003 were contained in approximately 12,000 letters, and the 47,000 requests in 2005 were contained in approximately 19,000 letters."  (Id.)

According to the OIG Report, there are three main reasons for the dramatic increase in the number of NSL requests issued starting in 2003.  (See id. 45.)  First, the Patriot Act eliminated the requirement that an NSL be issued only if "there are specific and articulable facts giving reason to believe that the person or entity to whom the information sought pertains is a foreign power or an agent of a foreign power." 18 U.S.C. § 2709(b) (2000).  Instead, the information must currently satisfy only the lower standard of being "relevant to an authorized investigation to protect against international terrorism or clandestine intelligence activities." 18 U.S.C. § 2709(b).  Second, whereas previously an NSL had to be approved by a senior FBI official at FBI headquarters, NSLs can now be authorized by Special Agents in Charge at FBI field offices.  As a result, approval is no longer a lengthy process, and generally takes only two to five days. (See OIG Report 25.)  Third, in 2003, the Attorney

General issued revised guidelines governing the use of NSLs in FBI national security investigations (the "NSI Guidelines"). The revised NSI Guidelines permit NSLs to be issued during preliminary investigations; under the prior NSI Guidelines, they could be issued only during full investigations.[14] (See OIG Report 40.) The OIG Report concludes that "[t]aken together, these three expansions of the FBI's [NSL] authorities resulted in significantly greater use" of NSLs. (Id. 45).

FBI officials describe NSLs as "indispensable investigative tools that serve as building blocks in many counterterrorism and counterintelligence investigations." (Id. xlvi.) In particular, the most important use of § 2709 NSLs, as described by FBI officials, is "to support FISA applications for electronic surveillance, physical searches, or pen register/trap and trace orders." (Id. 48.) NSLs are also important in that they assist the FBI in collecting information sufficient to eliminate concerns about investigative subjects and close national security investigations with a greater degree of confidence. (See id.

---

[14]   Prior to 2003, the NSI Guidelines authorized two levels of investigative activity -- preliminary inquiries and full investigations. (OIG Report 16-17.) NSLs were not authorized for use in preliminary inquiries, unless prior approval was obtained from the Attorney General or FBI Director. (Id.) The NSI Guidelines authorize three levels of investigations -- threat assessments, preliminary investigations, and full investigations. (Id.) The NSI Guidelines do not permit the FBI to use NSLs during a threat assessment but do permit the use of NSLs during a preliminary investigation. (Id.)

44.)  Moreover, often the target of an NSL is not necessarily the main target of an investigation, and an NSL thus serves as a key tool in allowing the FBI to follow leads.  As the OIG Report notes, "[f]or example, if the response to an NSL for toll billing records on the subject's telephone number identifies a telephone number that the subject contacted frequently during a time period relevant to the investigation, the FBI may issue another NSL requesting subscriber information for that telephone number."  (Id. 118.)

While the OIG Report provides helpful background on how NSLs are actually used by the FBI, Plaintiffs emphasize that the report also details significant misuse of NSLs by the FBI, which Plaintiffs claim supports their argument that the statute, in its current form, is too susceptible to abuse to survive First Amendment scrutiny.  Specifically, the OIG Report found that in addition to significantly under-reporting the number of NSL requests issued, the FBI: (1) under-reported violations arising from the use of NSLs; (2) sought information not permitted by the statute; (3) issued NSLs without proper authorization; (4) issued over 700 "exigent letters" requesting the type of information covered by § 2709 without following the process for obtaining an NSL; and (5) repeatedly failed to properly adhere to the FBI's own internal documentation requirements for the approval of an NSL.  (See

-15-

id. 66-107.)    In  summary,  while  noting  the  significant
challenges  and  major  structural  changes  the  FBI  was  facing
during  the  period  covered  and  the  lack  of  any  misuse  rising  to
the  level  of  criminal  misconduct,  the  OIG  Report  nonetheless
concluded  that  "the  FBI  used  NSLs  in  violation  of  applicable
NSL  statutes,  Attorney  General  Guidelines,  and  internal  FBI
policies."  (Id. 124.)

E.    PLACING NSLs ISSUED UNDER § 2709 IN CONTEXT

As  discussed  at  length  in  Doe I,  the  issuance  of  NSLs
under  §  2709  is  just  one  of  many  investigatory  tools  the
government  uses  to  gather  information.   See 334 F. Supp. 2d at
484-91.    The  Government  stresses,  as  it  did  in  Doe I
arguments,  that  the  nondisclosure  provision  in  the  revised  §
2709  is  not  unique  in  requiring  secrecy  in  the  context  of
confidential  investigations.   However,  a  review  of  those  other
investigatory  tools  reveals  that,  in  comparison  to  statutes
which  allow  for  the  imposition  of  secrecy  in  other  contexts,
the  revised  §  2709,  even  with  the  limited  judicial  review
contemplated  in  §  3511,  remains  a  very  broad  and  substantially
onerous  secrecy  provision.

1.    Administrative Subpoenas

Several  federal  statutes  authorizing  administrative
subpoenas,  for  example,  "permit  the  investigating  agency  to
apply  for  a  court  order  to  temporarily  bar  disclosure  of  the

inquiry, generally during specific renewable increments or for an appropriate period of time fixed by the Court, where such disclosure could jeopardize the investigation." Id. at 485 (citing 12 U.S.C. § 3409(b), 15 U.S.C. § 78u(h)(4)(A), 18 U.S.C. § 2705(b), and 18 U.S.C. § 3486(a)(6)(A)). Significantly, these provisions generally both place the burden on the government to seek a court-issued nondisclosure order and specifically contemplate a time limit on any secrecy imposed. See id.

2.   Pen Registers, Wiretaps, and Foreign Intelligence Surveillance

In Doe I, the Court noted that there were only three federal statutes "arguably analogous" to § 2709 in terms of the breadth of its nondisclosure rules. See id. at 514-15. The Court stated:

> First, communications firms are categorically barred, unless otherwise ordered by a court, from ever disclosing that a pen register or trap and trace device is in effect. Second, communications firms are categorically barred, subject to a similar exception "as may otherwise be required by legal process," from ever disclosing that a wiretap or electronic surveillance is in place. Third, recipients of a subpoena under FISA are categorically prohibited from ever disclosing to any person, "other than those persons necessary to produce" the records sought, that the subpoena was ever issued.

Id. Addressing this point, the Government emphasizes that these three statutes -- 18 U.S.C. § 3123(d)(2) (pen registers), 18 U.S.C. § 2511(2)(a)(ii) (wiretaps), and 50 U.S.C. § 1861(d) (Foreign Intelligence Surveillance Act

("FISA") subpoenas) -- "permit the government to preserve the secrecy of its investigations by prohibiting disclosure by non-government actors, automatically and with no special procedural protections." (Gov't Opp. 20.)   Thus, the Government argues, the "NSL statute, which explicitly permits judicial review, provides more procedural protection than the long-standing wiretap and pen register statutes, in which nondisclosure is automatic 'unless or until ordered by the court,' the only procedure for judicial review is ex parte and does not require the government to justify non-disclosure, and the statute sets forth no standard or time limit for lifting the prohibition on disclosure." (Id. 21.)

However, the Court's observation in Doe I highlights what still remains a relevant and critical distinction between these provisions and § 2709:  those statutes generally "apply in contexts in which a court authorizes the investigative method in the first place," 334 F. Supp. 2d at 515, and indeed provide for judicial review safeguards not only prior to surveillance, but also after is has concluded.   The lone exception is that certain FISA surveillance orders may be obtained solely based on a certification by the Attorney General that the surveillance meets the statutory requirements.   See id. at 515 n.208 (noting that this exception may be justified because "the FISA orders are

-18-

specifically limited to electronic surveillance of foreign governments and their agents" and consequently do not implicate the First Amendment rights of American citizens).[15]

Thus, while a telephone company may be prohibited from disclosing the existence of a wiretap on one of its customers, that wiretap can not be legally installed in the first instance without an Article III judge determining, pursuant to application by the government, and in advance of the restraint on constitutional rights, that there is "probable cause" for the government to believe both that the target of the wiretap is engaged in illegal activity and that the wiretap will assist in obtaining communications concerning that activity, and also that the government has demonstrated to the court's satisfaction that normal investigative procedures have failed or are unlikely to succeed.  See 18 U.S.C. § 2518(3).  The standard for obtaining a pen register or trap-and-trace device is less rigorous.[16]  See 18 U.S.C. § 3123(a) (simply requiring

---

[15] The Court notes that new legislation signed by President Bush on August 4, 2007 appears to expand the government's ability to conduct surveillance of American citizens under FISA without a warrant.  See James Risen, Bush Signs Law to Widen Reach for Wiretapping, N.Y. Times, Aug. 6, 2007, at A1. Warrantless surveillance of phone calls and emails are authorized under the new legislation if the target is "reasonably believed" to be overseas, even if the target is communicating with an American citizen in the United States. Id.

[16] As explained in Doe I, pen registers and trap-and-trace devices record certain electronic communications data indicating the origins and destinations of various "dialing, routing, addressing, or signaling information," e.g. the phone numbers dialed to and from a telephone.  See 18 U.S.C. § 3123(c); 334 F. Supp. 2d at 488-89.

certification from a law enforcement official that information sought would be "relevant to an ongoing criminal investigation").  Clearly, the lower standard reflects that installation of a pen register or trap-and-trace device on an individual's phone is far less intrusive than a wiretap which allows law enforcement access to the contents of the target's communications.  Nevertheless, installation of a pen register or trap-and-trace device does require judicial review and a showing of relevance to an ongoing investigation.

Moreover, both surveillance tools place durational limits on their use.  Wiretaps are generally limited to no more than thirty-day periods, after which the government must apply for an extension.  See 18 U.S.C. § 2518(5).  Pen registers and trap-and-trace devices are limited to sixty-day periods, after which the government must apply for an extension.  See 18 U.S.C. § 3121(c).  Significantly, with respect to wiretaps, once the wiretap intercept has concluded, an additional judicial safeguard goes into effect.  Within ninety days the issuing judge "shall cause to be served ... an inventory" which notifies the targets of the wiretap (and possibly others) of the occurrence of the surveillance, unless the government makes an ex parte showing of good cause that the serving of the inventory should be postponed.  See 18 U.S.C. § 2518(8)(d).

The wiretap and pen register statutes do not specify precisely when the restriction on disclosure by the communications provider terminates.  With respect to wiretaps, the communications provider is prohibited from disclosing "the existence of" any interception or surveillance, except as otherwise required by law and only after prior notification of law enforcement authorities.  See 18 U.S.C. § 2511(2)(a)(ii). As for pen registers, "the person owning or leasing the line or other facility" to which the device is attached may not disclose the "the existence of" the device or "the existence of" the investigation "unless and until otherwise ordered by the court."  See 18 U.S.C. § 3123(d).  The wording of both statutes, and in particular their use of the phrase "the existence of," implies that communications providers might be free to discuss wiretaps and pen registers, as well as their knowledge of underlying criminal investigations, after those investigations are completed.  After that time, the government presumably has no interest in prohibiting the communications provider from revealing its role in the investigation, and it is unlikely that a permanent ban on disclosure could be justified under the First Amendment.

    3.   <u>Secrecy in Grand Jury Proceedings</u>

Federal Rule of Criminal Procedure 6(e) governs secrecy in grand jury proceedings.  The "federal rules impose

stringent secrecy requirements on certain grand jury participants, including the attorneys, court reporters, and grand jurors." Doe I, 334 F. Supp. 2d at 486. However, witnesses called before the grand jury are not under an obligation of secrecy. See In re Grand Jury, 490 F. 3d 978, 985 (D.C. Cir. June 29, 2007) ("[T]he theory of grand jury secrecy is that the witness is guaranteed against compulsory disclosure, the privilege must therefore be that of the witness, and rests upon his consent.") (citations omitted).

The majority of states follow the approach of the federal rules and generally exempt witnesses from grand jury secrecy obligations. See 1 S. Beale & W. Bryson, Grand Jury Law and Practice § 5.5 (2d ed. 2006). Several states, however, do impose some secrecy obligations on grand jury witnesses. See id. ("[T]en [states] impose an obligation of secrecy on witnesses, but exempt communications between the witness and his attorney; and three impose an obligation of secrecy on witnesses without such an exemption.").

The secrecy governing grand jury proceedings is justified by its function, which is to "inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred." United States v. R. Enterprises, Inc., 498 U.S. 292, 297 (1991). Thus, the grand jury "can investigate merely

-22-

on suspicion that the law is being violated, or even just because it wants assurance that it is not." United States v. Morton Salt Co., 338 U.S. 632, 642-43 (1950).  The secrecy of the proceedings ensures that witnesses feel free to testify fully and frankly, that those under investigation are not tipped off to the proceeding, and that those exonerated by the grand jury are not publicly embarrassed. See In re Grand Jury Subpoena, Judith Miller, No. 04-3138, 3139, 3140, 2007 WL 1855055, at *2, (D.C. Cir. 2007) (citations omitted).

Because grand jury secrecy provisions are justified by the government's need to keep its investigations confidential, their duration is generally limited to the term of the grand jury or the period of investigation. See, e.g., Butterworth v. Smith, 494 U.S. 624, 626 (1990) ("We hold that insofar as the Florida law prohibits a grand jury witness from disclosing his own testimony after the term of the grand jury has ended, it violates the First Amendment to the United States Constitution."); Hoffmann-Pugh v. Keenan, 338 F.3d 1136, 1137 (10th Cir. 2003) (upholding Colorado grand jury secrecy statute that "precludes the witness from divulging her testimony even after the term of the grand jury has ended if the investigation of the crime continues.").

### III.   DISCUSSION

As the Court observed in Doe I, this case presents novel

-23-

issues involving both the security of the nation and the rights of citizens under the First Amendment.  The government's use of NSLs to obtain private information about activities of individuals using the internet is a matter of the utmost public interest.  As the OIG Report evenhandedly documents, the NSL serves as a critical tool to enable the government to perform investigations and law enforcement functions vital to the nation's safety and security.  But, as powerful and valuable as it may be as a means of surveillance, and as crucial the purpose it serves, the NSL nonetheless poses profound concerns to our society, not the least of which, as reported by the OIG, is the potential for abuse in its employment.  Through the use of NSLs, the government can unmask the identity of internet users engaged in anonymous speech in online discussions.  It can obtain an itemized list of all of the emails sent and received by the target of the NSL, and it can then seek information on individuals communicating with that person.  It may even be able to discover the websites an individual has visited and queries submitted to search engines.  In light of the seriousness of the potential intrusion into the individual's personal affairs and the significant possibility of a chilling effect on speech and association -- particularly of expression that is critical of the government or its policies -- a compelling need exists

to ensure that the use of NSLs is subject to the safeguards of public accountability, checks and balances, and separation of powers that our Constitution prescribes.

Accordingly, the issue now before the Court is not whether, or under what circumstances, the government should possess the authority to issue NSLs.  Rather, the more fundamental question is the extent of the authority that the First Amendment allows the government to exercise in keeping its use of NSLs secret, insofar as such secrecy inhibits freedom of speech.

The Court's review of First Amendment jurisprudence yields two primary conclusions.  First, the government's use of nondisclosure orders must be narrowly-tailored on a case-by-case basis.  That is, a nondisclosure order may not be broader in either scope or duration than the degree of secrecy required to serve the government's interest in protecting national security.  Second, the nondisclosure orders must be subject to meaningful judicial review.  To conform to prevailing constitutional norms as read by this Court, taking into account the unique latitude and added flexibility national security needs demand under ordinary circumstances, as well as the practicalities of surveillance work before a target is adequately identified, in issuing an NSL the government must either affirmatively terminate the

nondisclosure requirement or bear the burden of justifying to a court why continued secrecy is necessary within a reasonable period of time after the FBI issues an NSL containing a nondisclosure order.

Additionally, and in many ways most troubling, this Court finds that the standard of review the Reauthorization Act directs that the courts must apply when a nondisclosure order is challenged, offends the fundamental constitutional principles of checks and balances and separation of powers. Independent of the First Amendment deficiencies identified by the Court, the deferential standard of review imposed on reviewing courts by § 3511(b) fails not only because it creates too great a danger that constitutionally protected speech will be suppressed, but more fundamentally because it reflects an attempt by Congress and the executive to infringe upon the judiciary's designated role under the Constitution. To conform with § 3511(b) as drafted, a court reviewing a nondisclosure order must apply not the standard of review the judge determines is mandated by constitutional law, but an overly deferential standard imposed by Congress.  It is axiomatic that in our system of government it is the province of the courts to say what the law is.  When Congress attempts to curtail or supersede this role, it jeopardizes the delicate balance of powers among the three branches of government and

endangers the very foundations of our constitutional system. Thus, for this reason as well, § 3511(b) fails.

A.    <u>STANDARD OF REVIEW</u>

    Plaintiffs have moved for summary judgment, pursuant to Fed. R. Civ. P. 56(c), and the Government has cross-moved to dismiss, pursuant to Fed. R. Civ. P. 12(b), or in the alternative, for summary judgment. In considering a motion to dismiss, the "court may only rely on the factual allegations set forth in the complaint itself and not on additional matters asserted in affidavits, exhibits or other papers submitted in conjunction with the motion." <u>See</u> <u>Friedl v. City of New York</u>, 210 F.3d 79, 83-84 (2d Cir. 2000). Because both sides have submitted affidavits and other materials, the Government's motion must be considered a motion for summary judgment. <u>See</u> <u>id.</u> at 83.

    The Court may grant summary judgment only if it finds that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Here, the Court concludes that no facts material to the disposition of the case are in dispute and that this case presents only legal questions appropriate for decision on summary judgment.

B.    <u>STANDING</u>

    Plaintiffs assert a facial and as-applied challenge to §

-27-

2709 and § 3511.  "It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." <u>Forsyth County, Georgia v. The Nationalist Movement</u>, 505 U.S. 123, 129 (1992).  This rule applies because "the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the Court." <u>Id.</u>  As the Supreme Court has observed, "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech -- harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." <u>Virginia v. Hicks</u>, 539 U.S. 113, 119 (2003).  Consideration of the Plaintiffs' facial challenge is appropriate here because, as detailed below, the statutory provisions at issue are broadly written and certainly have the potential to suppress constitutionally protected speech.

C.   <u>STRICT SCRUTINY</u>

The Court's analysis begins by noting that for the same reasons articulated in <u>Doe I</u>, <u>see</u> 334 F. Supp. 2d at 511-13, the nondisclosure provision of the revised § 2709, like its predecessor, embodies both a prior restraint and a content-

based restriction on speech.  The nondisclosure provision of
the amended § 2709 still acts as a prior restraint because it
still prohibits speech before it occurs.  See id. at 511-12;
see also Doe II, 386 F. Supp. 2d at 73.  In granting the FBI
authority to certify that an NSL recipient cannot disclose to
any person information about receipt of the NSL, and in
including this prescription in the actual NSL letter issued,
the amended § 2709(c) "authorizes suppression of speech in
advance of its expression." Ward v. Rock Against Racism, 491
U.S. 781, 795 n.5 (1989); see also Alexander v. United States,
509 U.S. 544, 550 (1993) ("The term prior restraint is used to
'describe administrative and judicial orders forbidding
certain communications in advance of the time that such
communications are to occur.'") (quoting M. Nimmer, Nimmer on
Freedom of Speech § 4.03, at 4-14 (1984)) (emphasis added in
Alexander).

Additionally, the amended § 2709(c) continues to act as
a content-based restriction on speech.  In Doe I, the
Government argued that § 2709(c) was not a content-based
restriction because it prohibited disclosure irrespective of
a speaker's viewpoint.  See 334 F. Supp. 2d at 512.  The
Court disagreed, finding that although the pre-Reauthorization
Act § 2709(c) was neutral with respect to viewpoint, it
nonetheless functioned as a content-based restriction because

-29-

it closed off an "entire topic" from public discourse.  See id. at 513 ("'The First Amendment's hostility to content-based regulation extends not only to restrictions of particular viewpoints, but also to prohibition of public discussion of an entire topic.'") (quoting Consolidated Edison Co. of New York v. Public Serv. Comm'n, 447 U.S. 530, 537 (1980)).  The nondisclosure requirement of the revised § 2709(c) continues to close off discussion of an entire topic.  Prohibiting an NSL recipient from discussing anything about the NSL it received, including even the mere fact of receipt, means that "the first-hand experiences of NSL recipients," id. at 513, are completely excluded from the public debate.  Likewise, the Doe II court, which also found § 2709(c) to be a content-based restriction, stated that it had "the practical impact of silencing individuals with a constitutionally protected interest in speech and whose voices are particularly important to an ongoing, national debate about the intrusion of governmental authority into individual lives."  386 F. Supp. 2d at 75.  Indeed, Plaintiffs indicate that as a result of the nondisclosure requirement enforced in this case, they have been precluded from fully contributing to the national debate over the government's use of surveillance tools such as NSLs, perhaps most particularly consequential in inhibiting their ability to speak and inform public discourse on the issue

during Congress's consideration of the Reauthorization Act.

Presumably, Congress's intention in amending 2709(c) to allow the FBI to certify on a case-by-case basis whether nondisclosure is necessary was to more narrowly tailor the statute to reduce the possibility of unnecessary curtailment of speech.  Unfortunately, one necessary consequence of the resulting discretion now afforded the FBI is that the amended 2709(c) creates the risk not only that an "entire topic" of public debate will be foreclosed, but also the risk that the FBI might engage in actual viewpoint discrimination.  By now allowing the FBI to pick and choose which NSL recipients are prohibited from discussing the receipt of an NSL, conceivably the FBI can engage in viewpoint discrimination by deciding to certify nondisclosure when it believes the recipient may speak out against the use of the NSL and not to require nondisclosure when it believes the recipient will be cooperative.  Thus, the statute has the potential to "contravene the fundamental principle that underlies [the Supreme Court's] concern about 'content-based' speech regulations: that 'government may not grant the use of a forum to people whose views if finds acceptable, but deny use to those wishing to express less favored or more controversial views.'"  City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48-49 (1986) (quoting Police Dep't of Chicago v. Mosley,

408 U.S. 92, 95-96 (1972)).  The Government's position is that
the FBI's discretion does not create the opportunity for
viewpoint discrimination because the prohibition on
nondisclosure is premised not on the content of any expected
speech but on the circumstances of the counterterrorism or
counterintelligence investigation, which may require secrecy
in order to preserve the integrity of the investigation.
Although this response suggests a relevant point, the
Government's alleged concern solely with the effect of speech
rather than the speech itself does not render 2709(c) any more
content-neutral.  See Forsyth County, 505 U.S. at 134
("Listeners' reaction to speech is not a content-neutral basis
for regulation.").

     As a prior restraint and content-based restriction, the
amended statute is hence subject to strict scrutiny.  See Doe
I, 334 F. Supp. 2d at 511.  The Government indicates that,
although it reserves the issue of the appropriate level of
scrutiny for appeal, it does not argue this issue in light of
the Court's prior determination in Doe I. (See Gov't Opp. 11.)

     The statute can survive strict scrutiny only if it is
"narrowly tailored to promote a compelling government
interest," United States v. Playboy Entm't Group, Inc., 529
U.S. 803, 813 (2000), and there are no "less restrictive
alternatives [that] would be at least as effective in

-32-

achieving the legitimate purpose that the statute was enacted to serve." Reno v. ACLU, 521 U.S. 844, 874 (1997).  Any restriction on speech which is content-based and acts as a prior restraint is presumed unconstitutional, and the government bears the burden of demonstrating that the provision satisfies strict scrutiny.  See R.A.V. v. City of St. Paul, 505 U.S. 377, 382 (1992) ("Content based restrictions are presumptively invalid."); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963) ("Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity."); Playboy Entm't Group, 529 U.S. at 816 ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.").

As Doe I also acknowledged, the government's asserted interest in seeking to impose a gag on NSL recipients -- protecting the nation's security by preventing terrorism -- is certainly compelling in appropriate circumstances.  See 334 F. Supp. 2d at 513 ("[T]he Government's interest in protecting the integrity of international terrorism and counterintelligence investigations is a compelling one."); see also Haig v. Agee, 453 U.S. 280, 307 (1981) ("It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation.") (quoting

-33-

Aptheker v. Secretary of State, 378 U.S. 500, 509 (1964));
Detroit Free Press v. Ashcroft, 303 F.3d 681, 706 (6th Cir.
2002) ("The Government certainly has a compelling interest in
preventing terrorism.").[17]   Thus, the Court must consider
whether § 2709(c), in light of the judicial review now
afforded by § 3511(b), constitutes a sufficiently narrowly
tailored means of advancing the government's compelling
interest in national security.

     As was the case with the Court's initial decision,
fundamentally this ruling is "about the process antecedent to
the substance of any particular challenge."   Id. at 475
(emphasis in original).   Thus, the Court first considers
whether the process relating to the issuance and review of an
NSL requiring nondisclosure is sufficiently narrowly tailored
to ensure that First Amendment rights are not unnecessarily
abridged.   When a statute confers discretion on government
officials to suppress speech, as § 2709(c) does, that
discretion must be reasonably limited by objective criteria.
See Thomas v. Chicago Park Dist., 534 U.S. 316, 324 (2002).
Moreover, the government must exercise its discretion within
a system that allows for "procedural safeguards designed to

---

[17] Because the government's asserted basis for issuing the nondisclosure
order in this case is national security, the Court limits its analysis to
that governmental interest.   The Court does not address whether the other
Enumerated Harms listed in § 2709(c), such as "interference with
diplomatic relations," constitute sufficiently compelling governmental
interests under the circumstances.

obviate the dangers of a censorship system." Freedman v. Maryland, 380 U.S. 51, 58 (1965). Such safeguards must include an opportunity for meaningful judicial review. Finally, even where the government has demonstrated a compelling interest justifying the restriction of expression, any such restriction must be narrowly tailored both in scope and duration. As detailed below, the nondisclosure provision of § 2709(c), even with the safeguard of the judicial review afforded by § 3511(b), prescribes a process that is constitutionally deficient under the First Amendment in several respects.

D.   PROCEDURAL SAFEGUARDS

Plaintiffs contend that the NSL nondisclosure provision, § 2709(c), constitutes a "paradigmatic licensing scheme," in that "the FBI is invested with the discretion to determine, on a case-by-case basis, whether a gag order should be issued with respect to any given NSL." (Memorandum of Law in Support of Motion for Partial Summary Judgment ("Pls.' Mem."), dated Sept. 8, 2006, at 11.) Plaintiffs argue that § 2709(c) is therefore unconstitutional because it fails to provide the requisite procedural safeguards set forth by the Supreme Court in Freedman.

1.   The Freedman Safeguards

Freedman involved a Maryland motion picture censorship

statute that made it unlawful to exhibit a motion picture prior to obtaining the approval of the Maryland State Board of Censors (the "Board"), which was empowered to bar the exhibition of any film that it considered "obscene" or that, in its opinion, tended to "debase or corrupt morals or incite to crimes." 380 U.S. at 52 & nn.2-3. Under the statute, a film exhibitor was required to submit the film to the Board for approval prior to showing it, and the exhibitor could appeal a disapproval to a Maryland state court.

The Freedman Court held that such a system "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." Id. at 58 (emphasis added). In particular, the Supreme Court held that the following safeguards are required: (1) any restraint in advance of judicial review may be imposed only for "a specified brief period," (2) any further restraint prior to "a final judicial determination on the merits" must be limited to "the shortest fixed period compatible with sound judicial resolution," and (3) the burden of going to court to suppress the speech and the burden of proof once in court must rest on the censoring government. Id. at 58-59.

The Supreme Court held the Maryland statute unconstitutional because it placed no time limits on a

-36-

determination by the Board, gave no assurance of prompt judicial review, and placed the burden of challenging the Board's determination on the exhibitor rather than the government.  See id. at 59-60.  The Court recognized that "[b]ecause the censor's business is to censor, there inheres the danger that he may well be less responsive than a court -- part of an independent branch of government -- to the constitutionally protected interests in free expression." Id. at 57-58.  Additionally, the "exhibitor's stake in any one picture may be insufficient to warrant a protracted and onerous course of litigation." Id. at 59.  Consequently, the Supreme Court concluded that without adequate procedural safeguards ensuring prompt judicial review, "the censor's determination may in practice be final." Id. at 58.

    As a preliminary matter, this Court finds that § 2709(c) does constitute a form of licensing.  In Doe I, the Government argued that the prior version of § 2709(c) did not create a licensing scheme in which the FBI had discretion to pick and choose among speakers to restrain.  See 334 F. Supp. 2d at 512.  The Court commented that such a system "works identically to the most severe form of a licensing system -- one in which no licenses are granted." Id. (emphasis in original); see also Doe II, 386 F. Supp. 2d at 74 ("The suppression of speech here is broader than any licensing

-37-

scheme.  It constitutes a categorical prohibition on the use
of any fora for speech, on all topics covered by § 2709(c), as
contrasted with a licensing scheme, which limits only a
particular forum.").  The current version of § 2709(c) does
grant the FBI discretion to determine which disclosures it
believes must be restricted.  Specifically, as outlined above,
the FBI may issue a nondisclosure order when the Director of
the FBI, or his designee, certifies that disclosure of the NSL
"may result" in one of the Enumerated Harms.  See 18 U.S.C. §
2709(c)(1).  The addition of this discretion to the revised §
2709(c) scheme transforms it from a "blanket proscription on
future speech," Doe I, 334 F. Supp. 2d at 512, to a system in
which the FBI, based on its own case-by-case assessment, now
has broad discretion to grant some NSL recipients permission
to disclose certain information pertaining to their receipt of
an NSL and to deny others that freedom.

Determining that § 2709(c) embodies a form of licensing,
however, does not end the inquiry as to whether the procedural
safeguards set forth in Freedman must apply to it.  Since
Freedman, the Supreme Court has addressed a broad range of
licensing systems, and it has decided, on a case-by-case
basis, whether Freedman's procedural protections are required
to validate the licensing at issue.  See, e.g., Thomas, 534
U.S. at 322 (Freedman inapplicable to licensing scheme that

-38-

represented a content-neutral time, place, and manner regulation of the use of a public forum); FW/PBS v. City of Dallas, 493 U.S. 215 (first two Freedman safeguards applicable to city ordinance regulating sexually oriented businesses); Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc., 487 U.S. 781 (1988) (Freedman safeguards applicable to professional licensing statute); National Socialist Party of Am. v. Village of Skokie, 432 U.S. 43 (1977) (Freedman safeguards applicable to a state court injunction prohibiting a parade); Blount v. Rizzi, 400 U.S. 410 (1971) (Freedman safeguards applicable to statute permitting Postmaster General to block letters and payments related to the sale of allegedly obscene materials).

As these cases illustrate, Freedman has been applied in diverse contexts. There is no basis justifying a conclusion that Freedman is limited to cases involving obscenity or sexually-oriented expression, as the Government suggests, or that it is somehow not applicable to cases that involve national security. (See Gov't Opp. 19.)

2. Application of Freedman

With respect to § 2709(c), the first and second Freedman protections, which require the availability of expeditious judicial review and that any restraint prior to judicial review must be brief, are satisfied by the procedures set

forth in § 3511(b) as it relates to NSL recipients.   That provision permits an NSL recipient to petition a court for an order modifying or setting aside a nondisclosure requirement. The nondisclosure prohibition is mandated as part of the NSL itself, and the recipient may challenge that restriction at any time after receipt of the NSL.   In Beal v. Stern, the Second Circuit held that "prompt access to judicial review in state courts" would satisfy the first two Freedman protections.   184 F.3d 117, 129 (2d Cir. 1999).   This conclusion holds true with respect to judicial review in federal courts as well.

The third Freedman safeguard, the requirement that the government bear the burden both of initiating judicial review and, once in court, of justifying the prior restraint, is not satisfied by § 3511(b), which places the burden of challenging the nondisclosure order on the NSL recipient.   The question for the Court, therefore, is whether, on the premise that Freedman applies to the statutory design of § 2709, the First Amendment requires that the third Freedman procedural safeguard govern the validity of § 2709(c).   Specifically, the Court must determine whether, as Plaintiffs argue, the reasoning and analysis underlying the Freedman decision apply with equal force in this context, or whether, as the Government counters, the form and scope of the First Amendment

harm as well as the compelling national security interests at issue differ so substantially that this procedural protection is not demanded in this case.

Comparing the licensing scheme embodied in § 2709(c) with that at issue in Freedman, many shared characteristics are apparent.  Both statutes give an agency of the executive branch broad discretion to restrict a particular category of speech, on a case-by-case basis, based solely on its content. The decision to limit speech is made by the government agent prior to any judicial determination as to whether the restriction is constitutional.  Although the context of the public exhibition of motion pictures differs substantially from the asserted national security interests entailed in the disclosure of an NSL, both situations present a serious risk of unconstitutionally restricting speech.  Importantly, both licensing schemes involve the inherent danger that the government agency might be "less responsive than a court ... to the constitutionally protected interests in free expression," Freedman, 380 U.S. at 57-58, as well as the substantial likelihood that the censored party -- in this case the ECSP -- will not have an adequate incentive to challenge the nondisclosure order in court.  As in Freedman, "[b]ecause the censor's business is to censor," 380 U.S. at 57, the ultimate concern is that, in the absence of adequate

procedural safeguards, the licensing determination "may in practice be final," id. at 58, resulting in a broad de facto power to censor constitutionally protected speech.

Two essential considerations distinguish the licensing scheme at issue here from that in Freedman. First, Freedman addressed a system aimed at discerning obscene films, which presumably would not be entitled to First Amendment protection, from those that the Board viewed as "moral and proper," id. at 52 n.2.   In contrast, here the speech in question -- information regarding the government's monitoring of its citizens' activities, especially when the actions surveilled encompass legitimate expression -- is a central concern of the First Amendment.   See Gentile v. State Bar of Nevada, 501 U.S. 1030, 1034 (1991) ("There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment."); Butterworth, 494 U.S. at 632 ("[I]nformation relating to alleged governmental misconduct [is] speech which has traditionally been recognized as lying at the core of the First Amendment.").   The risk of investing the FBI with unchecked discretion to restrict such speech is that government agents, based on their own self-certification, may limit speech that does not pose a significant threat to national security or other compelling governmental interest.   See New York Times v. United States,

403 U.S. 713, 727 n.* (1973) ("[T]here is no question but that the material sought to be suppressed is within the protection of the First Amendment; the only question is whether, notwithstanding that fact, its publication may be enjoined for a time because of the presence of an overwhelming national interest.") (Brennan, J., concurring).  If the Supreme Court found the Freedman safeguards necessary even in the narrow context of potentially unprotected expression encompassed by obscenity restrictions, logically the safeguards are all the more appropriate in ensuring that core political speech is not suppressed in the absence of a compelling government interest.

Second, Freedman involved what the Government refers to as "the classic form of licensing censorship" (Gov't Opp. 17), in which an individual proposes to communicate certain ideas or expressions of that person's own creation, and a governmental agency then passes judgment on whether the individual should be restricted from speaking to others about the prohibited subject.  In the context of § 2709(c), the information that is encompassed by the restriction on its communication is that the FBI has served the NSL on the recipient.  The recipient acquires this information only through its interaction with the government and, not having created or initiated the information, has no prior intent to communicate it.  The Government argues on this basis that §

-43-

2709(c) is "a far cry from the pure form of prior-restraint censorship addressed in <u>Freedman</u>." (Gov't Opp. 18.) Accordingly, the Government contends that § 2709(c) requires none of the procedural safeguards outlined in <u>Freedman</u>.

The question for the Court, therefore, is whether the fact that government is the source of the information at issue mandates that communication of that information by other persons be subject to less First Amendment protection. In <u>Doe I</u>, the Court addressed this question by reviewing a line of cases involving secrecy provisions relating to grand jury proceedings and judicial misconduct hearings. <u>See</u> 334 F. Supp. 2d at 516-19. Those cases demonstrate that, in analyzing the validity of certain secrecy statutes under the First Amendment, courts have distinguished information speakers learned by virtue of participation in a government investigation from information they obtained independently.

<u>Seattle Times Co. v. Rhinehart</u> involved the right of a newspaper to publish confidential information that it had gained through discovery in a civil litigation and that was subject to a protective order issued by the trial court. <u>See</u> 467 U.S. 20 (1984). The Supreme Court held that the protective order did not violate the First Amendment, reasoning that the newspaper had acquired the information "only by virtue of the trial court's discovery processes," and

-44-

that it had "no First Amendment right of access to information." Id. at 32. Accordingly, the Court applied intermediate scrutiny in light of its conclusion that "continued court control over the discovered information does not raise the same specter of government censorship that such control might suggest in other situations." Id.

The Supreme Court shed further light on its Rhinehart holding in United States v. Aguilar, 515 U.S. 593 (1995). Likening the newspaper's situation to that of government officials in sensitive confidential positions, the Court noted: "As to one who voluntarily assumed a duty of confidentiality, governmental restrictions on disclosure are not subject to the same stringent standards that would apply to efforts to impose restrictions on unwilling members of the public." Id. at 606. An NSL recipient, on the contrary, does not voluntarily assume a duty of confidentiality; that duty is unilaterally imposed on him by the FBI. Furthermore, as the Doe II court emphasized, an order prohibiting the "use of material a civil litigant has requested in discovery ... differs greatly from a law barring disclosure of the use of the government's authority to compel disclosure of information." 386 F. Supp. 2d at 75.

In Butterworth, the Court held that a Florida grand jury secrecy statute violated the First Amendment insofar as it

-45-

"prohibit[ed] a grand jury witness from disclosing his own testimony after the term of the grand jury has ended." 494 U.S. at 626. Justice Scalia, concurring, emphasized that the case before the Court presented only the issue of prohibiting a grand jury witness "from making public what he knew before he entered the grand jury room," as opposed to prohibiting "disclosure of the grand jury proceedings, which is knowledge he acquires not 'on his own' but only by virtue of being made a witness." Id. at 636.

In Kamasinski v. Judicial Review Council, the Second Circuit applied this distinction in a First Amendment challenge to a Connecticut statute that prohibited certain disclosures related to judicial misconduct hearings held by the state's Judicial Review Council ("JRC"). See 44 F.3d 106 (2d Cir. 1994). The Kamasinski Court held that the restrictions at issue were content-based and that strict scrutiny therefore applied -- "the challenged regulations must be necessary to serve a compelling state interest and be narrowly drawn to serve that end." Id. at 109. The Circuit Court then enumerated three categories of information potentially subject to the statute: (1) "the substance of an individual's complaint or testimony," (2) "the complainant's disclosure of the fact that a complaint was filed, or the witness's disclosure of the fact that testimony was given,"

-46-

and (3) "information that an individual learns by interacting with the JRC, such as information gained by hearing the testimony of other witnesses or comments made by members of the JRC." Id. at 110 (emphasis in original). Recognizing that each of these categories of information "involves differing First Amendment interests," the Circuit Court considered them separately under the strict scrutiny standard. Id. It held that prohibition of the first category of information would clearly violate the First Amendment, but that the state had sufficiently compelling interests to justify a limited ban on disclosure of the latter two categories for the duration of the initial investigatory phase of the proceedings. See id. at 110-12.

In Doe I, the Court concluded from its analysis of these cases that "laws which prohibit persons from disclosing information they learn solely by means of participating in confidential government proceedings trigger less First Amendment concerns than laws which prohibit disclosing information a person obtains independently." Id. at 518. This statement simply reflects that, as Kamasinski illustrates, a restriction on information acquired by way of a confidential government investigation is more likely to satisfy strict scrutiny in light of two unique considerations inherent in those proceedings: the compelling government

-47-

interest in keeping ongoing investigations secret, and the safeguard that the restraint is necessarily narrowly tailored to curtail the minimum of speech.  See id. at 516 ("[C]ourts generally uphold secrecy statutes in connection with official investigations in recognition of two vital considerations: the importance of secrecy and that the secrecy is limited ... to facts learned only by virtue of a given person's participation in the proceeding.").  The Court's remark is not meant to suggest, however, that a restriction on such speech is subject to anything less than strict scrutiny -- or, as the Government here felicitously phrases it, "a less stringent application of strict scrutiny."  (Gov't Opp. 27.)   In the present case, therefore, the decision as to whether the third Freedman safeguard is required must not be made on the basis that the speech that the NSL statute restricts is worthy of less than full constitutional protection, but rather on a determination of whether that safeguard is essential to preventing unwarranted restrictions on speech.

In clarifying the applicability and scope of the third Freedman safeguard, an examination of the Supreme Court's decision in FW/PBS is instructive.  In FW/PBS, the Supreme Court examined a Dallas ordinance that imposed on sexually oriented businesses an onerous set of inspections, which were required whenever ownership changed hands or the business

applied for the annual renewal of its permit.  <u>See</u> 493 U.S. at
225.  As was the case of the licensing scheme in <u>Freedman</u>, the
ordinance placed no time limitation on the city governing
completion of the inspections.  The Supreme Court held that
the first two <u>Freedman</u> safeguards must apply to the ordinance.
<u>See</u> <u>id.</u> at 228.

 With respect to the third <u>Freedman</u> safeguard, however,
a plurality of the Court[18] distinguished the ordinance at issue
on the ground that the city did not engage in direct
censorship of particular speech, but simply reviewed the
qualifications of the license applicants -- "a ministerial
action that is not presumptively invalid."  <u>Id.</u> at 229.  The
plurality also noted that, unlike in <u>Freedman</u>, the license
applicant, whose business depended on obtaining a license, had
a strong incentive to challenge an unfavorable determination
in court.  Because of these two differences, the plurality
concluded that "the First Amendment does not require that the
city bear the burden of going to court to effect the denial of
a license application or that it bear the burden of proof once
in court."  <u>Id.</u> at 230.

 A number of circuit courts, including the Second Circuit,
have interpreted <u>FW/PBS</u> as limiting the application of the

---

[18] <u>FW/PBS</u> was decided by plurality opinion.  Three Justices concluded that
only the first two <u>Freedman</u> safeguards applied, three Justices concluded
that all three <u>Freedman</u> safeguards applied, and three Justices concluded
that <u>Freedman</u> was inapposite.

third Freedman safeguard to "those situations in which 'the censor engaged in direct censorship of particular expressive material,'" and not where the government does "'not exercise discretion by passing judgment on the content of any protected speech.'"  MacDonald v. Safir, 206 F.3d 183, 195 (2d Cir. 2000) (quoting FW/PBS, 493 U.S. at 229); see also N.W. Enterprises Inc. v. City of Houston, 352 F.3d 162, 194 (5th Cir. 2003); MacDonald v. City of Chicago, 243 F.3d 1021, 1035-36 (7th Cir. 2001); Ward v. County of Orange, 217 F.3d 1350, 1354-55 (11th Cir. 2000); Steakhouse, Inc. v. City of Raleigh, 166 F.3d 634, 640-41 (4th Cir. 1999).  This analysis supports a determination that the third Freedman safeguard should apply to a review of § 2709(c).  As discussed above, and determined in both Doe I and Doe II, the NSL nondisclosure provision embodies a content-based prior restraint on speech, in that the FBI decides in advance to restrict certain speech of the recipient -- the issuance and receipt of a particular NSL -- based solely on its content.  Unlike the city authority in FW/PBS, in issuing a nondisclosure order, the FBI does not make its determination based strictly on the characteristics or qualifications of the NSL recipient; nor could its decision be described as merely a routine "ministerial action."

The FW/PBS decision also supports application of the third Freedman safeguard in evaluating the constitutionality

of § 2709(c) here on the ground that an NSL recipient -- an ECSP -- will generally lack the incentive to challenge the nondisclosure order in court -- as noted by the Supreme Court in <u>Freedman</u>.  <u>See</u> 380 U.S. at 59.  Such a challenge would be time consuming and financially burdensome, and, unlike the situation in <u>FW/PBS</u>, the NSL recipient's business does not depend on overturning the particular form of restriction on its speech.  That NSL recipients generally have little or no incentive to challenge nondisclosure orders is suggested by empirical evidence.  Although the FBI issued 143,074 NSL requests from 2003 to 2005 alone[19] (<u>See</u> OIG Report 36), the most recent year for which figures have been released, only two challenges have been made in federal court since the original enactment of the statute in 1986.  <u>See</u> <u>Doe I</u>, 334 F. Supp. 2d at 502 ("The evidence suggests that, until now, none of those NSLs was ever challenged in any court."); <u>Doe II</u>, 386 F. Supp. 2d at 74 n.6.  The Court is not aware of any additional challenges to an NSL gag order that have been made since the statute was revised to allow for challenges pursuant to § 3511.

     3.   <u>The NSL Statute Fails to Satisfy Freedman</u>

     In light of these considerations, the Court concludes

---

[19] The OIG Report indicates that the "overwhelming majority" of these NSL requests were issued under § 2709. (OIG Report 36-37.)

that the third <u>Freedman</u> procedural safeguard does apply to judicial review of the NSL statute.  Accordingly, it is the government that must bear the burden of going to court to suppress the speech and that must bear the burden of proof once in court.  Section 2709(c) grants broad discretion to the FBI to completely restrict constitutionally protected speech on the basis of its content, and it places the burden of challenging this restriction in court solely on the NSL recipient -- a party that, in the overwhelming majority of cases, lacks any real incentive to do so.  The combination of these factors makes it likely that the FBI would possess broad, unchallenged, and "in practice ... final" power, <u>Freedman</u>, 380 U.S. at 58, to restrict a wide band of protected speech -- a result prohibited by the Constitution.  As Justice Brennan wrote in his <u>FW/PBS</u> concurrence, "Mistakes are inevitable; abuse is possible.  In distributing the burdens of initiating judicial proceedings and proof, we are obliged to place them such that we err, if we must, on the side of speech, not on the side of silence."  493 U.S. at 241-42.

That the government bears the burden of justifying the need for nondisclosure to a court does not mean that the FBI must obtain the approval of a court prior to issuing an NSL with a nondisclosure order.  In light of the first two <u>Freedman</u> protections, the FBI may issue a temporary

-52-

nondisclosure order on its own in accordance with the standards set forth in § 2709(c), provided that, within a reasonable and brief period of time, it must either notify the NSL recipient that the order is no longer in effect, or justify to a court the need for a continued period of nondisclosure. This observation does not imply, however, that an NSL recipient may not, at any time, also petition a court to modify or set aside a nondisclosure order, but simply that the burden can not be placed solely on the recipient to do so.

Allowing the FBI to issue nondisclosure orders for a limited period of time prior to any judicial oversight balances the strong First Amendment concerns at issue with the FBI's need to act quickly in conducting counterterrorism investigations. This balance also takes into account that, as described in the OIG Report, the FBI is now using NSLs as an information-gathering tool in the preliminary phase of its investigations. It allows the FBI measured discretion, sufficient but not greater than necessary, to issue NSLs with nondisclosure orders, without demanding that it immediately be required to produce evidence substantiating its assertion that disclosure might endanger national security.

E.   DISCRETION

Plaintiffs argue that § 2709(c) violates the First Amendment because the standard governing the issuance of

nondisclosure orders provides the FBI with unbridled discretion to suppress speech.  Plaintiffs assert that a scheme that invests executive officers with such broad discretion to suppress speech is unconstitutional even if it otherwise affords adequate procedural safeguards. (See Pls.' Mem. 21 (citing FW/PBS, 493 U.S. at 226).)

In Shuttlesworth v. City of Birmingham, the Supreme Court considered a local ordinance that allowed city officials to refuse a parade permit if "the public welfare, peace, safety, health, decency, good order, morals or convenience" required that the permit be denied.  394 U.S. 147, 149-50 (1969). Finding that the ordinance gave city officials "virtually unbridled discretion and absolute power" to deny a permit, the Court found the ordinance unconstitutional.  Id. at 150.  The Court held that an ordinance that "makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official ... is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms."  Id. at 150-51.

Accordingly, courts are generally skeptical of licensing schemes that grant extensive or undefined discretion to government officials.  See Forsyth County, 505 U.S. at 131 ("If the permit scheme involves the appraisal of facts, the exercise of judgment and the formation of an opinion by the

licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted.") (citations omitted); City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 769 (1988) ("It is apparent that the face of the ordinance itself contains no explicit limits on the mayor's discretion. Indeed, nothing in the law as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application."); Safir, 206 F.3d at 192 (the statute, "which allows the Commissioner to deny a permit if he believes the parade 'will be disorderly in character or tend to disturb the public peace,' ... appear[s] to afford the Commissioner exactly the sort of discretion that has been found to violate the First Amendment."); Nichols v. Village of Pelham Manor, 974 F. Supp. 243, 251 (S.D.N.Y. 1997) (invalidating statute that allowed Chief of Police to deny license based on considerations of "health, comfort and convenience of the residents").

These cases make clear that any statute that provides officials with discretion to potentially suppress speech through a license must also contain "narrow, objective and definite standards to guide the licensing authority." Shuttlesworth, 394 U.S. at 150. Plaintiffs argue that § 2709, by allowing an FBI official to prohibit disclosure of an NSL

-55-

if that official believes disclosure "may result" in any one of the Enumerated Harms, including "a danger to the national security of the United States," fails to provide such narrow, objective and definitive standards.

Plaintiffs argue that a standard based on "a danger to national security," among other potential harms, is simply not susceptible to an objective test.  They contend that the term "national security" is inherently vague, and they point out that it has been used in the past to "cloak many questionable executive practices." (Reply in Support of Plaintiffs' Motion for Partial Summary Judgment and Opposition to the Government's Motion to Dismiss or for Summary Judgment ("Pls.' Reply"), dated Dec. 15, 2006, at 17.)  Additionally, Plaintiffs express concern that there is no objective criteria to guide the FBI in determining what level of threat is sufficient to require nondisclosure of the NSL.  (See Pls.' Reply 18 ("How significant must a threat be before it is deemed to 'endanger' one of the specified government interests? Is any non-negligible threat sufficient?  Is even a negligible threat sufficient?") (emphasis in original)).

Indeed, the Supreme Court has indicated that "[t]he danger to political dissent is acute where the Government attempts to act under so vague a concept as the power to protect 'domestic security.'  Given the difficulty in defining

-56-

the domestic security interest, the danger of abuse in acting to protect that interest becomes apparent." United States v. United States District Court, 407 U.S. 297, 314 (1972); see also New York Times, 403 U.S. at 719 ("The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment.") (Black, J. and Douglas, J., concurring).

The invitation to abuse of discretion, Plaintiffs contend, is compounded by the breadth of discretion conferred on the FBI; the FBI, without any prior independent review, merely needs to certify that disclosure "may" result in any one of the Enumerated Harms. Cf. New York Times, 403 U.S. at 725-26 ("The entire thrust of the Government's claim throughout these cases has been that publication of the material sought to be enjoined 'could,' or 'might,' or 'may' prejudice the national interest in various ways. But the First Amendment tolerates absolutely no prior judicial restraints of the press predicated upon surmise or conjecture that untoward consequences may result.") (Brennan, J., concurring).

Plaintiffs' arguments are not without merit. Without doubt, § 2709(c) confers broad discretion to the FBI to accompany NSLs with nondisclosure orders -- it may do so upon certification that disclosure of the NSL "may" result in any

-57-

of the several Enumerated Harms.  In particular, the Court agrees that a standard relating to endangering "national security" is susceptible to very broad interpretation. However, the Court is not persuaded that the FBI's discretion under § 2709(c) is so unrestrained as to rise to the level of a constitutional infirmity.  While the Court recognizes that the standard is broadly phrased, it is also mindful of the limitations of language to capture the fine lines distinguishing the permissible from the proscribed, and the legitimate exercise of government discretion from the infringement on protected rights.  As the Second Circuit has observed, "'[p]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity,' and 'flexible' standards granting 'considerable discretion' to public officials can pass constitutional muster."  Field Day, LLC v. County of Suffolk, 463 F.3d 167, 179 (2d Cir. 2006) (quoting Ward v. Rock Against Racism, 491 U.S. at 794).

That the rubric of "national security" has been abused on occasion does not imply that the Court should presume the language of "national security" in § 2709(c) necessarily affords unfettered discretion to the FBI likely to result in abuse.  Despite past abuses, it remains "well-settled doctrine that courts grant substantial deference to the political

-58-

branches in national security matters." Doe I, 334 F. Supp.
2d 523; see also Zadvydas v. Davis, 533 U.S. 678, 696 (2001)
(courts may afford "heightened deference to the judgments of
the political branches with respect to matters of national
security").

The context of counterterrorism investigations requires
that the FBI have a degree of discretion in using NSLs to
gather information about the targets of investigations and
others who may be involved peripherally.  Deference by courts
to executive determinations of threats to "national security"
exists in part because evaluating such threats is not a
precise science, and some flexibility is necessary in making
such determinations in the first instance.  Thus, the Court is
convinced that requiring further tailoring of the
discretionary standard of § 2709(c) would be unlikely to offer
significant benefits to First Amendment concerns and could
lead to "regulations that are so tightly worded that the
flexibility needed for administration is lacking." Safir, 206
F.3d at 191.

As the Court stated in Doe I, "[t]he high stakes here
pressing the scales ... compel the Court to strike the most
sensitive judicial balance, calibrating by delicate increments
toward a result that adequately protects national security
without unduly sacrificing individual freedoms." 334 F. Supp.

2d at 478.  In striking this balance, the Court finds that the FBI's discretion in certifying a need for nondisclosure of an NSL is broad but not inappropriately so under the circumstances.  As detailed elsewhere in this opinion, the best protection against abuse of the FBI's discretion in certifying nondisclosure is to ensure that such discretion is checked by meaningful and reasonably expeditious judicial review.

F.   <u>PRESCRIBING THE STANDARD OF JUDICIAL REVIEW</u>

As the Court has already made clear, judicial review of the Reauthorization Act's nondisclosure requirement is subject to strict scrutiny. Section 3511(b) allows a reviewing court to modify or set aside the nondisclosure requirement of an NSL issued under § 2709 only "if it finds that there is no reason to believe that disclosure" will lead to one of the Enumerated Harms. 18 U.S.C. § 3511(b)(2).  Moreover, if an authorized Justice Department or FBI official certifies that disclosure may "endanger the national security of the United States or interfere with diplomatic relations, such certification shall be treated as conclusive unless the court finds that the certification was made in bad faith."  <u>Id.</u>  The Court agrees with Plaintiffs that this standard is plainly at odds with First Amendment jurisprudence which requires that courts strictly construe content-based restrictions and prior

restraints to ensure they are narrowly tailored to advance a compelling government interest.  A court reviewing a statute implicating the First Amendment must review that statute in accordance with First Amendment doctrine.  See Blount, 400 U.S. at 420 (provision which required a district court to "grant the relief sought by the Postmaster General upon a showing merely of 'probable cause'" did not "satisfy the demands of the First Amendment," which required more meaningful judicial review).

    1.    Congress Cannot Legislate a Standard of Review at
          Odds with First Amendment Jurisprudence

          a.    Historical Context of Checks and Balances and
                Separation of Powers

Because the discussion of the next point addresses elementary issues that are already very well known, an introductory note may be in order to explain the reason for what may seem like unnecessary rehashing.  In fact, some things broadly familiar are so self-evident that they should not need to be said, for at times the axiomatic annoys or embarrasses by tedious repetition.  Yet, sometimes we are compelled to recite the obvious again because on occasion, counter to even the most constant refrain of the same theme, the message still goes unnoticed, or inadequately considered, perhaps ignored.  For instance, the proscription against impermissible entry upon another person's land, while

universally accepted, and despite the posting of prominent "No Trespass" signs, fails to stop all intrusions. Whatever the reason, when the risks and the valuables at stake are high enough, some reiteration of the plain and simple may be justifiable, because there comes a point at which the encroachment poses clear, serious danger, and prudence and self-protection then counsel us to take the greater precautions called for by the occasion, which may mean erecting a clearer demarcation of the boundaries, or placing additional, more distinct or sharper warnings.

In this spirit, what follows is a reminder of a crucial concept often repeated in this country's history and jurisprudence. When the Founders designed our constitutional democracy, they divided the government into three branches. Each part of it was assigned distinct functions with corresponding powers. Each segment was separate but coequal. Yet, while independent of the others, the workings of each were integrated as a whole. In the interest of securing the stability and endurance of the unified structure, the roles designated for each branch were designed to serve distinct purposes, both as control and as sentry: to govern over the subjects and functions that fell within its domain, and to guard against threats, internal as well as external, to what each was uniquely charged to protect. See City of Boerne v.

Flores, 521 U.S. 507, 535-36 (1997) ("Our national experience teaches that the Constitution is preserved best when each part of the Government respects both the Constitution and the proper actions and determinations of the other branches.").

Hence, in the plan of the Constitution, Congress was expressly authorized to write the laws, and in furtherance of that task was granted control over the national purse.  The president was empowered to enforce the law and protect the national security, and to those ends bestowed command over the armed forces.  And to the judiciary was delegated a duty that, on balance, was perhaps the most delicate responsibility of all: the power to say what, in the last analysis, the law is -- an authority that entails ensuring that the Constitution, as interpreted by the courts, remains the supreme law of the land.   See Marbury v. Madison, 5 U.S. 137, 177 (1803) (declaring that "it is emphatically the province and duty of the judicial department to say what the law is."); see also The Federalist, No. 78 (Hamilton).

In exercising that role as final arbiter of the structure and content of the law as it derives from the Constitution, though the judiciary cannot levy taxes or raise armies, the courts were entrusted as guardians of another vital national resource:  the fundamental rights and liberties of the people. The success of judicial protection under this mandate

depends upon ensuring that at all times the governmental system functions as ordered, that each branch remains within its proper contours in performing the duties assigned to it, and that none encroaches upon the provinces conferred upon the others.  To these ends, the Constitution erected interlocking barriers in the form of checks and balances embodied in various provisions.  For, the Framers, manifesting both the concerns that motivated the governmental blueprint they drafted, and the genius and wisdom of their unique plan, realized that absent such critical separations, the system would face constant peril in the event all power were concentrated, whether by delegation, accretion, or arrogation, in the same hands.  That prospect, in the Founders' fears, amounted to a license for abuse of power and potential tyranny, dangers likely to be paid for with the liberties of a free people.

In this essential tenet, in maintaining the delicate checks and balances and separation of powers among its constituent branches at all times, rests the integrity and survival of our nation's form of government.  To guarantee that lasting stability demands that each branch honors its own bounds of authority, and those of the others.  The courts of course cannot legislate or administer executive offices.  By the same token, Congress and the executive must abide by the

rule of law, in times of domestic tranquility and of national crisis, in war and in peace.  As the Supreme Court recognized early in our constitutional history, the measure and adjustment of the proper balance of governmental power is a unique obligation of the judiciary.  In the words of Chief Justice Marshall: "[T]he courts were designed to be an intermediate body between the people and the legislative, in order, among other things, to keep the latter within the limits assigned to their peculiar authority.  The interpretation of the laws is a proper and peculiar province of the courts."  Marbury, 5 U.S. at 178; see also Hamdi v. Rumsfeld, 542 U.S. 507, 536 (2004) ("We have long since made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens."); Home Bldg. & Loan Ass'n v. Blaesdell, 290 U.S. 398, 426 (1934) ("[E]ven the war power does not remove constitutional limitations safeguarding essential liberties."); Ex parte Milligan, 71 U.S. 2, 120-21 (1866).

> b.   Application of the Principles Separation of Powers

Against this backdrop of history and constitutional premises, § 3511(b) is invalid because it does not reflect full account of these controlling principles and the long-standing national experience from which their force derives. That provision amounts to a significant congressional

incursion, one with profound implications, into exclusive
jurisdictional ground the Constitution reserves for the
judiciary's role in our government.  Of greatest concern, the
law encroaches onto what is perhaps the most consequential
authority the courts possess: the sole power to judge how to
take the proper measure of the validity of a statute as
aligned against the precepts of the Constitution itself, and
to that end decide what constitutional rule of law must apply
to guide that crucial test.  Thus, this aspect of the
Reauthorization Act, however legitimate and compelling the
national interests it otherwise embodies, fails a test of
recognition, insofar as it breaches the proper constitutional
limits drawn for our government by the concepts of separation
and balance of power.  In this respect, the statute overlooks
a potential risk, weighty in its far-reaching implications.
All could be lost of the judiciary's most vital function, and
hence of the individual freedoms of Americans, if the courts
were to cede fundamental decisional power to Congress, and
were Congress in turn empowered to override the courts in
laying down the law that governs constitutional review of
legislation or of an action of the executive.

Moving from the general to the particulars, the Court
finds that the standard of review prescribed in § 3511(b) is
sharply at odds with the standard of review the Supreme Court

has explicitly held is required to assess the conformance of a statute with the strictures of the First Amendment. Congress cannot legislate a constitutional standard of review that contradicts or supercedes what the courts have determined to be the standard applicable under the First Amendment for that purpose. See Dickerson v. United States, 530 U.S. 428, 437 (2000) ("Congress may not legislatively supersede our decisions interpreting and applying the Constitution."); Marbury, 5 U.S. at 177 ("It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act.").

The Government argues that the standard set forth in § 3511 is merely a codification of the deferential standard of review applied by courts to executive determinations to prohibit disclosure of information in the interest of national security. The Government points out that in Doe I this Court specifically acknowledged that deference. See 334 F. Supp. 2d at 523. But even while acknowledging that the Government should be accorded a due measure of deference when it asserts that secrecy is necessary for national security, the Court in Doe I nonetheless applied strict scrutiny to the nondisclosure provision of § 2709.

The Court begins with the observation that a

distinguishing factor between the review standard codified in § 3511(b) and cases of national security deference cited by the Government -- and this Court in <u>Doe I</u> -- generally involve the courts <u>voluntarily</u> crediting an invocation of national security and <u>voluntarily</u> deferring to the executive in a particular instance.  Thus, in those cases, judicial deference and restraint was self-imposed, in the courts' own recognition of their lack of expertise in assessing highly sensitive matters under the particular circumstances of the case before them.  Here, § 3511(b) <u>mandates</u> when and how deference should be accorded.  Congress has in effect prescribed to the judiciary the standard of review a court must apply in assessing the validity of a government restriction on First Amendment rights in every case and every circumstance arising under the statute, thereby transforming judicial deference into subservience to executive judgments.

It is well settled by many years of judicial interpretation of the First Amendment that a statute which constitutes a prior restraint on speech or a content-based restriction on speech must be strictly construed, meaning that it must be narrowly tailored to advance a compelling government interest.  That is what the judiciary has said the constitutional law is on this vital principle.  Congress, even as an accommodation to the executive branch on matters of

national   security,   cannot   say   that   that   constitutional
standard   is   something   else.   That   is   precisely   what   § 3511
attempts   to   do   insofar   as   it   decrees   the   standard   of   review
and   level   of   deference   the   judiciary   must   accord   to   the
executive   in   adjudicating   a   challenged   restriction   on
protected speech.

The Supreme Court's decision in <u>Dickerson</u> and <u>City of</u>
<u>Boerne</u> are both instructive on this point.   In <u>Dickerson</u>, the
Supreme Court held that Congress could not legislatively alter
the   Supreme   Court's   previously   established   and   well-known
<u>Miranda</u> rights.   <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).
As the <u>Dickerson</u> Court explained, in <u>Miranda</u> it had "laid down
'concrete   constitutional   guidelines   for   law   enforcement
agencies   and   courts   to   follow' "   to   ensure   a   criminal
suspect's Fifth Amendment right against self-incrimination was
not violated.   530 U.S. at 435.   <u>Miranda</u> meant that even if a
criminal suspect in custody voluntarily made statements during
an   interrogation,   those   statements   ordinarily   could   not   be
used against that individual if no <u>Miranda</u> warnings had been
provided.   Two years after <u>Miranda</u>, Congress enacted a statute
effectively dispensing with the <u>Miranda</u> warnings and requiring
only that a statement be voluntary to be admissible.   <u>Id.</u> at
435 (the statute at issue was 18 U.S.C. § 3501).   The Supreme
Court in <u>Dickerson</u>, finding that the <u>Miranda</u> decision did

-69-

announce a "constitutional rule," concluded that Congress could not legislatively supersede such a rule.  Id. at 437.

Similarly, in City of Boerne, the Supreme Court considered the constitutionality of legislation which required courts to apply strict scrutiny when challenges were brought against neutral, generally applicable laws under the Free Exercise Clause of the First Amendment.  The Supreme Court had previously stated that such laws could be applied to religious practices even when government officials could not point to a compelling interest supporting the challenged law.  See 521 U.S. at 512-13 (referring to Employment Div., Dep't of Human Res. of Ore. v. Smith, 494 U.S. 872 (1990)).  Thus, the Supreme Court found Congress had exceeded its authority, holding that "[w]hen the Court has interpreted the Constitution, it has acted within the province of the Judicial Branch .... When the political branches of the Government act against the background of a judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including stare decisis, and contrary expectations must be disappointed."  Id. at 536.

What these cases make clear is that when the judiciary has established a "constitutional rule," such as requiring

that any prior restraint or content-based restriction on speech be narrowly tailored to support a compelling government interest, the courts must respect and apply such previously established rules in reviewing a challenge to a government curtailment of constitutionally protected expression, even if Congress and the executive branch urge otherwise.

        c. <u>Prospective Concerns</u>

    Having found that in adopting the Reauthorization Act's standard of review provision Congress impermissibly crossed over its jurisdictional bounds under the letter of the Constitution, the Court deems it appropriate at this point to identify the specific dangers to our form of government that it finds deeply problematic in respect of the statute under the spirit of the Constitution as well, and that potentially lurk in the shadows of the law if the encroachment were allowed to stand.  For § 3511 raises grave concerns not just for what it is, but for what it could become if not effectively checked.  Under these circumstances, a court should present the clearest and most instructive articulation of the pertinent law, offering guidance not only as to what is wrong with the particular statute under judicial consideration in the light of constitutional imperatives but also of potential pitfalls, as viewed from all relevant perspectives. As drafted, § 3511(b) could serve as a precedential step

toward the development of a much larger and more fearsome vehicle for legislative or executive intrusion into the business of the courts. Conceivably, what might commence as an innocent legislative step over a blurry line in the dark, could later stretch into a means of farther and more detrimental invasion of the courts' prerogatives -- the legislative equivalent of breaking and entering, with an ominous free pass to the hijacking of constitutional values.

The pernicious consequences which that prospect could trigger cannot be overstated, or lightly discounted. If Congress were able not only to enact the substance of legislation, but also to prescribe the precise corresponding rule telling the courts what level of scrutiny to apply in properly gauging the constitutionality of the statute's application in practice, the barriers against government abuse that the principles of separation and balance of powers were designed to erect could be severely compromised, and may eventually collapse, with consequential diminution of the judiciary's function, and hence potential dire effects to individual freedoms. In that event, the courts' exercise of judicial review could effectively be reduced to that of a mere mouthpiece of the legislature. And with the courts so enervated, Congress would possess what would amount to a self-regulated means, by way of a back door when it so elected, to

-72-

decide that the Constitution means whatever Congress says it means.  Any piece of legislation could then be equipped, as a standard feature, with its own brand of judicial review of Congress's choosing, which could be styled to make the validation of the law foolproof.

Once embarked on such a course, how far the legislative limits may be pushed before they go too far and the harms become intolerable is uncertain.  More certain is that few of the possible outcomes are likely to end happily.  What would deter the legislative branch, dispensing with niceties and formalities altogether, from eventually superseding the standards of review the courts have devised for application in deciding First Amendment disputes -- the concept of strict scrutiny, for example, -- and formulating its own rules to govern such judicial oversight?

These concerns may be readily dismissed as protesting too much, as conjuring a remote, unduly alarmist parade of horrors.  But those who are inclined, for the risk of the moment, to give chance a chance by wagering against the improbable, should consult history for its guidance as to what the roll of the dice may hold in predictable situations.  The past is long, and so is the future we want to protect.  But too often memory is short.  The pages of this nation's jurisprudence cry out with compelling instances illustrating

that, called upon to adjudicate claims of extraordinary assertions of executive or legislative or even state power, such as by the high degree of deference to the executive that the Government here contends § 3511(b) demands of the courts, when the judiciary lowers its guard on the Constitution, it opens the door to far-reaching invasions of liberty. See, e.g., Korematsu v. United States, 323 U.S. 214 (1944); Plessy v. Ferguson, 163 U.S. 537 (1896).  These examples, however few in number, loom large in proportions of the tragic ill-effects felt in the wake of the courts' yielding fundamental ground to other branches of government on the constitutional role the judiciary must play in protecting the fundamental freedoms of the American people.  Viewed from the standpoint of the many citizens who lost essential human rights as a result of such expansive exercises of governmental power unchecked by judicial rulings appropriate to the occasion, the only thing left of the judiciary's function for those Americans in that experience was a symbolic act: to sing a requiem and lower the flag on the Bill of Rights.

     To cite the teaching of one case, in 1944 the Supreme Court, amidst public passions wartime aroused, and under the mantle of national security and military expediency, endorsed the president's exercise of unilateral authority to relocate all Americans of Japanese descent (but not those of other

nations also at war with the United States) to internment camps for the duration of the hostilities. See Korematsu, 323 U.S. at 216-18. Later, that ruling was much regretted not only for what it represented as a retreat from the judiciary's constitutional function in safeguarding American liberties and democratic principles, but for the potentially deleterious precedent it set of the courts' bowing unjustifiably to extraordinary actions of the other branches of the government. See Korematsu v. United States, 584 F. Supp. 1406, 1420 (N.D. Cal. 1984) ("As historical precedent [Korematsu] stands as a constant caution that in times of war or declared military necessity our institutions must be vigilant in protecting constitutional guarantees.  It stands as a caution that in times of distress the shield of military necessity and national security must not be used to protect governmental actions from close scrutiny and accountability.").

Indeed, just eight years after Korematsu, the president, invoking the same theory of inherent power, national defense, and military exigency that prevailed in Korematsu, sought to nationalize the nation's steel mills in order to avert a strike by steelworkers. See Youngstown Steel & Tube Co. v. Sawyer, 343 U.S. 579, 582-83 (1952).  But, by contrast, on that occasion the Supreme Court was not deferential to a comparably extraordinary claim of unbounded executive power

that would have trampled upon the principle of separation of powers.   While  <u>Youngstown  Steel</u>  concerned  executive encroachment on Congress's authority under the Constitution, the  separation  of  powers  principle  the  Supreme  Court reaffirmed applies with equal force in this context as well: "The Founders of this Nation entrusted [the power to say what the law is under the Constitution to the courts] alone in both good times and bad times.  It would do no good to recall the historical  events,  the  fears  of  power  and  the  hopes  for freedom that lay behind their choice."  <u>Id.</u> at 589.

As <u>Doe I</u> noted, the Court recognized the "heavy weight" of September 11, 2001, "a murderous attack of international terrorism, unparalleled in its magnitude, and unprecedented in America's national security," that looms over this proceeding. <u>See</u> 334 F. Supp. 2d at 477-78. Its effect is still felt and acknowledged by this Court, which sits just a few blocks from where the World Trade Center towers fell. The Court is also mindful  of  the  executive's  need  to  meet  new  threats  to national  security  with  new  and  ever  more  effective  means  of detecting and stopping those perils. Indeed, since September 11, 2001 the executive has sought additional ways of securing the  nation,  which  is  its  prerogative,  including  efforts  at expanding  its  surveillance  powers.  However,  new  methods  of protecting  and  combating  threats  that  result  in  asserted

expansions of executive power underscore the courts' concerns of the dangers in suffering any infringement on their essential role under the Constitution.[20]   The Constitution was designed so that the dangers of any given moment would never suffice as justification for discarding fundamental individual liberties or circumscribing the judiciary's unique role under our governmental system in protecting those liberties and upholding the rule of law.[21]   It is the judiciary's independent

---

[20] For example, shortly after September 11, 2001, "President Bush authorized the NSA to begin a counter-terrorism operation that has come to be known as the Terrorist Surveillance Program ("TSP"). . . the TSP includes the interception (i.e. wiretapping), without warrants, of telephone and email communications where one party to the communication is located outside of the United States and the NSA has 'a reasonable basis to conclude that one party to the communication is a member of al Qaeda [or associated with al Qaeda].' " ACLU v. NSA, Nos. 06-2095, 06-2140, 2007 WL 1952370, at *1 (6th Cir. July 6, 2007). Significantly, while the Sixth Circuit dismissed the ACLU's constitutional challenge to the TSP on standing grounds, the District Court below concluded that the warrantless wiretapping allowed by the TSP violated, among other statutes and constitutional provisions, both the First Amendment and the separation of powers doctrine. See ACLU v. NSA, 438 F. Supp. 2d 754, 775-79 (E.D. Mich. 2006).  Also of note, once the TSP became public, the Attorney General advised Congress that "any electronic surveillance that was occurring as part of the [TSP] will now be conducted subject to the approval of the Foreign Intelligence Surveillance Court."  See ACLU v. NSA, 2007 WL 1952370, at *2 n.4.

[21] Illustrative is Hamdan v. Rumsfeld, 126 S. Ct. 2749 (2006), where the Supreme Court struck down the military commissions established by executive order to try suspected terrorists.  The Supreme Court rejected the broad assertion of executive power upon which the President asserted the authority to establish the commissions and concluded that "in undertaking to try Hamdan and subject him to criminal punishment, the Executive is bound to comply with the Rule of Law that prevails in this jurisdiction." (Thomas, J., dissenting) Id. at 2798. The facts of Hamdan highlight the importance of a vigilant judiciary in ensuring our constitutional values even when national security concerns are great. See Neal Kumar Katyal, Comment: Hamdan v. Rumsfeld: The Legal Academy Goes to Practice, 120 Harv. L. Rev. 65, 122 (2006) (in Hamdan, the Supreme Court "said something profound about America. A man with a fourth-grade education from Yemen, accused of conspiring with one of the world's most evil men, sued the most powerful man in the nation (if not the world), took the case to the highest court in the land, and won.  The Court's profound commitment to the rule of law is a beacon for other countries around the world. . . . In no other country would such a thing be

function to uphold the Constitution even if to do so may mean curtailing Congress's efforts to confer greater freedom on the executive to investigate national security threats.

2.   The Review Prescribed by §3511(b) Does Not Comport with First Amendment Jurisprudence

The Government attempts to minimize or dismiss the separation of powers concern raised by § 3511(b) by insisting that the provision is not at odds with strict scrutiny.  The cases cited by the Government do not support its assertion that the standard of review mandated by § 3511(b) is simply a codification of case law on the substantial deference courts afford the executive in matters of national security in which the information sought to be suppressed is of the government's own creation.

First, the majority of the cases cited by the Government deal with the Executive's right to refuse to disclose information sought under the Freedom of Information Act ("FOIA").  See, e.g., CIA v. Sims, 471 U.S. 159, 179 (1985) (the decisions of the CIA director not to disclose FOIA requested information "worthy of great deference given the magnitude of the national security interests and potential risks at stake"); Center for Nat'l Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 928 (D.C. Cir. 2003) ("[T]he

possible.")

government's top counterterrorism officials are well-suited
to" determine the harm that could result from disclosing
certain FOIA requested information, and "the judiciary is in
an extremely poor position to second-guess the executive's
judgment in this area of national security."). But judicial
review in the FOIA context of a statutorily created right to
obtain information of public interest, where it is the
disclosure sought by private persons of records created or
maintained by the government that is at stake, is not
analogous to the imperatives of judicial review in the context
of prohibitions imposed by the government on the private
speech that is implicated under § 2709. As the Doe II court
stated, the Plaintiffs' "desire here is to exercise their
First Amendment rights, which distinguishes this case from
those in which an individual seeks disclosure of information
... pursuant to FOIA. Here, [Plaintiffs] seek to vindicate a
constitutionally guaranteed right; they do not seek to
vindicate a right created, and limited, by statute." 386 F.
Supp. 2d at 78.

In McGhee v. Casey, 718 F.2d 1137 (D.C. Cir. 1983), also
cited by the Government in support of its deference argument,
the plaintiff sought to publish a manuscript of his
experiences as a CIA officer. The court emphasized that the
"difference between seeking to obtain information and seeking

to disclose information already obtained raises McGhee's constitutional interests in this case above the constitutional interests held by a FOIA claimant." Id. at 1147. The court in McGhee made clear that because First Amendment rights were implicated, it required the court to go beyond the FOIA standard of review. The McGhee court held that while courts should "defer to CIA judgment as to the harmful results of publication, they must nevertheless satisfy themselves from the record, in camera or otherwise, that the CIA in fact had good reason to classify, and therefore censor, the materials at issue. Accordingly, the courts should require that CIA explanations justify censorship with reasonable specificity, demonstrating a logical connection between the deleted information and the reasons for classification." Id. at 1148. Thus, in McGhee, where the plaintiff had voluntarily signed an agreement before joining the CIA that barred him from revealing classified information without prior approval, even though the court afforded substantial deference to the CIA's determinations, it still required a far more substantive showing to warrant restriction of private speech than the "no reason to believe" and conclusive, absent bad faith, certification standards of § 3511(b).

While the Court acknowledges that it is entirely appropriate for the judiciary, in the proper exercise of

judicial power, to defer to executive determinations that a specific disclosure of sensitive information may result in a specific harm to national security interests, that is not the end of the analysis, but merely the beginning.  Because the First Amendment is implicated, a reviewing court must still satisfy itself that the harm asserted by the government justifies the curtailment of the specific individual liberties implicated.  Although the Executive's tasks "include the protection of national security and the maintenance of the secrecy of sensitive information, the judiciary's tasks include the protection of individual rights." Id. at 1149.  The standard of review required by § 3511(b) impermissibly ties the judiciary's hands by requiring a reviewing court to effectively end its analysis as long the court finds a reason -- any reason -- to believe disclosure "may" lead to one of the Enumerated Harms.

The Government seems to argue here that the Court is still free to conduct a thorough analysis consistent with strict scrutiny because the "no reason to believe" standard merely sets forth the fact-finding inquiry a reviewing court must undertake when considering a request to modify or set aside a nondisclosure order.  Thus, the Government emphasizes that the determination as to whether one of the Enumerated Harms "may" result from disclosure of the NSL still rests with

the reviewing court.  See 18 U.S.C. § 3511(b)(2) (the court may modify or set aside the nondisclosure order "if it finds there is no reason to believe disclosure" may lead to one of the Enumerated Harms) (emphasis added).  Consequently, the Government argues that a reviewing court still has the freedom and the duty to satisfy itself whether in a particular case withholding disclosure of information about an NSL is necessary to avoid one of the Enumerated Harms.  Presumably, the Government envisions § 3511(b) functioning similar to judicial review of FOIA requests where the court will uphold the government's claim of exemption, as the District of Columbia Circuit declared in one case:

> 'on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'  The test is not whether the court personally agrees in full with the CIA's evaluation of the danger -- rather, the issue is whether on the whole record the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausiblity in this field of foreign intelligence in which the CIA is expert and given by Congress a special role.

Gardels v. CIA, 689 F.2d 1100, 1104-05 (D.C. Cir. 1982).

The Court has already acknowledged that national security is a compelling interest justifying nondisclosure in certain situations, and to the extent § 3511(b) explicitly identifies it as such, the statute can not be declared unconstitutional for this reason alone.  The statute fails constitutional

strict scrutiny, however, because it requires the court to blindly credit a finding that there "may" be a reason -- potentially any conceivable and not patently frivolous reason -- for it to believe disclosure will result in a certain harm. On this analysis, the statute thus contemplates an even less rigorous factual inquiry than is prescribed in the FOIA context, where the government's assertion of potential harm must pass the more demanding statutory test that it be reasonable, specific, and plausible.  See id.

Even if the Court were to construe § 3511(b) to require that the "reason" why the Government asserts disclosure "may" result in an Enumerated Harm be plausible, reasonable, and specific, the strict scrutiny analysis required by the First Amendment still demands more.  In applying strict scrutiny, whether, as articulated by the government and discerned by the court, a reason to believe exists that disclosure may result in one of the Enumerated Harms in a particular case does not necessarily mean that nondisclosure is warranted.  In that circumstance, the court is still compelled to balance the potential harm against the particular First Amendment interest raised by a particular challenge.

In further support of its assertion that the deference codified in § 3511(b) is appropriate, the Government also cites to North Jersey Media Group, Inc. v. Ashcroft, 308 F.3d

-83-

198 (3d Cir. 2002).    There, the Third Circuit held that
closure of "special interest" deportation hearings involving
Immigration and Naturalization Service detainees with alleged
connections to terrorism does not violate the First Amendment
right of access.   The Third Circuit concluded:

> We are keenly aware of the dangers presented by deference
> to the executive branch when constitutional liberties are
> at stake, especially in times of national crisis, when
> those liberties are likely in greatest jeopardy. <u>On
> balance</u>, however, we are unable to conclude that openness
> plays a positive role in special interest deportation
> hearings at a time when our nation is faced with threats
> of such profound and unknown dimension.

<u>Id.</u> at 220 (emphasis added).   As already noted, the Court's
task here is also to balance the need for the secrecy and
efficiency the executive requires with the need to protect
individual liberties.    Although emphasizing the deference
given to the executive branch on matters of national security,
the Third Circuit did note that it deferred "only to the
executive insofar as it is expert in matters of national
security, not constitutional liberties."    <u>Id.</u> at 219 n.15.
While the Third Circuit concluded that judicial deference on
national security issues involved in that case balanced in
favor of allowing First Amendment restrictions on access to
deportation proceedings, here the Court believes the "no
reason to believe" standard of review, if applied to a
challenge of an NSL, prohibits a court from ensuring that the
appropriate balance between competing public interests is

-84-

reached.

As the Sixth Circuit noted in <u>Detroit Free Press</u>, 303 F.3d at 692-93, in reaching a conclusion opposite to that of the Third Circuit in <u>North Jersey Media Group</u>: "While we sympathize and share the Government's fear that dangerous information might be disclosed in some of these hearings, we feel that the ordinary process of determining whether closure is warranted on a case-by-case basis sufficiently addresses their concerns.  Using this stricter standard does not mean that information helpful to terrorists will be disclosed, only that the Government must be more targeted and precise in its approach."   Similarly, a court reviewing the need for nondisclosure of an NSL must be free to make a determination on a case-by-case basis, and it must be free to do so applying the strict standards required by First Amendment jurisprudence as construed and applied by the courts, rather than the excessively deferential and inflexible rule Congress enacted in § 3511 at the behest of the Executive.

In an analogous context, the Fourth Circuit noted, in rejecting the government's argument that national security interests preclude the application of strict scrutiny with respect to the First Amendment right of access to judicial documents, that it was "troubled by the notion that the judiciary should abdicate its decisionmaking responsibility to

the executive branch whenever national security concerns are present. ... A blind acceptance by the courts of the government's insistence on the need for secrecy ... would impermissibly compromise the independence of the judiciary and open the door to possible abuse." In re Washington Post Co., 807 F.2d 383, 391-92 (4th Cir. 1986). This Court is similarly troubled by the suggestion that even though First Amendment rights are implicated, its ability to review a government restriction on speech is limited to situations where there is "no reason to believe" that disclosure may result in one of the Enumerated Harms. Such a review deprives the judiciary of its ability to properly balance the government's compelling national security interests against the First Amendment rights of persons affected by the nondisclosure requirement.

More problematic still, while the "no reason to believe" standard impermissibly constrains the Court's First Amendment review, the requirement that the Court credit the government's invocation of national security as conclusive absent evidence of bad faith eviscerates any meaningful judicial review, as it clearly equates to an uncritical acceptance of the government's insistence of the need for secrecy. In requiring the Court to accept the government's certification as conclusive, § 3511(b) effectively allows the government to determine the constitutionality of its own actions, leaving

only the difficult to prove and narrow issue of the existence of "bad faith" to the judiciary.   As the Supreme Court has previously noted in the Fourth Amendment context, "those charged with ... investigative and prosecutorial duty <u>should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks</u>. ... [U]nreviewed executive discretion may yield too readily to pressures to obtain incriminating evidence and overlook potential invasions of privacy and protected speech."   <u>United States District Court</u>, 407 U.S. at 317 (emphasis added).   For the reasons discussed, a standard of review which eliminates any meaningful check on executive discretion to suppress protected speech offends both the First Amendment and the basic constitutional principle of separation of powers.

G.   <u>NARROW TAILORING</u>

Section 2709(c) prohibits an NSL recipient from "disclos[ing] to any person ... that the [FBI] has sought or obtained access to information or records under this section." This nondisclosure provision contains no time limit. Plaintiffs argue that § 2709(c) violates the First Amendment by allowing the issuance of nondisclosure orders that are not narrowly tailored -- either in scope or duration -- to a compelling government interest.

The Court addressed this issue at length in <u>Doe I</u> with respect to the prior version of § 2709(c).  It stated that although nondisclosure may be justified under certain circumstances, the government must show "that secrecy is necessary for national security purposes in a <u>particular situation</u> involving <u>particular persons</u> at a <u>particular time</u>." <u>Doe I</u>, 334 F. Supp. 2d at 524 (emphasis in original).  The Court concluded that "the Government cannot cast § 2709 -- a blunt agent of secrecy applying in perpetuity to all persons affected in every case -- as narrowly-tailored." <u>Id.</u> at 516.

The revised provision incorporates case-by-case analysis in the determination as to whether nondisclosure of a particular NSL is necessary under the circumstances, but it continues to authorize nondisclosure orders that <u>permanently</u> restrict an NSL recipient from engaging in <u>any</u> discussion related to its receipt of the NSL.  As the Court explained in <u>Doe I</u>,

> Section 2709(c) prohibits any discussion of the first-hand experiences of NSL recipients, and of their officers, employees, and agents, and thus closes off that "entire topic" from public discourse.  Those persons are forever barred from speaking to anyone about their knowledge and role in the underlying events pertaining to the issuance of an NSL, however substantively limited or temporally remote that role may be, even at a time when disclosure of the occurrence of the investigation may have ceased to generate legitimate national security concerns and instead may hold historical or scholarly value then bearing relatively greater interest to the general public.

Id. at 513 (citation omitted).

The Government asserts that the scope of the nondisclosure order is "as narrow as can reasonably be expected, and prohibits only minimal disclosure."[22] (Gov't Opp. 33-34.) To the contrary, NSL recipients are effectively barred from engaging in any discussion regarding their experiences and opinions related to the government's use of NSLs. For example, an NSL recipient cannot communicate to anyone indefinitely that it received an NSL, the identity of the target, the type of information that was requested and/or provided, general statistical information such as the number of NSLs it received in the previous month or year, its opinion as to whether a particular NSL was properly issued in accordance with the applicable criteria, or perhaps even its opinion about the use of NSLs generally (e.g., whether NSLs are being used legitimately, whether their use may be stifling speech, whether the government may be abusing its power under the statute, etc.). Clearly, these various potential statements range widely both in their possible threat to national security and in their value to the national debate about the government's activities. Particularly when a prior restraint on speech may continue for an extended period of

---

[22] The Government, however, previously described § 2709(c) as a "broad non-disclosure requirement." (Declaration of David W. Szady ("Szady Decl."), dated June 28, 2004, ¶ 18.)

time, narrow tailoring requires that the scope of that nondisclosure be decided on a case-by-case basis.

It is perhaps telling that, in justifying the need for the nondisclosure provision of the NSL statute, the Government relies entirely on the possible harms to national security or diplomatic relations that could result from the disclosure of a particular NSL -- i.e., revealing that a named individual was the target of an NSL.  (See Szady Decl. ¶¶ 19-33; Gov't Opp. 34.)  Arguably, guarding the secrecy of that particular detail may be defensible as promoting national security interests in a given case.  The Government, however, provides no support for its argument that the much broader nondisclosure still permitted by § 2709(c) in all other circumstances serves a compelling government interest.

The potentially broad effect of the nondisclosure order is demonstrated in the present case.  Asserting a risk to national security, the Government has invoked the nondisclosure order to attempt to prevent Plaintiffs from publically disclosing through their court filings a wide range of information, such as statements disclosing the mere fact that the FBI issued an NSL to an unspecified internet service provider ("ISP"), the general type of information about its clients that the ISP in question maintains, the kinds of services the ISP provides to its clients, and, most troubling

to the Court, statements critical of the way that the government uses NSLs and expressing concern that free expression and association might be chilled. (<u>See</u> Third Declaration of Ann Beeson, dated Sept. 7, 2006, ¶¶ 9, 14, 15, 23-27; Pls.' Mem. 13-14.)

Additionally, it is worth noting that, in response to Plaintiffs' Motion to Set Aside Request for Records, the FBI has withdrawn its NSL request in this case. (<u>See</u> Oestericher Decl. ¶ 3.) Essentially, the FBI has conceded that the information that it would obtain by way of the NSL at issue is no longer relevant to an international terrorism investigation, but it continues to assert that any disclosure otherwise related to the NSL would endanger national security. (<u>See</u> Certification of Robert S. Mueller III, dated Oct. 30, 2006, attached as Ex. 1 to Oestericher Decl.)

With respect to duration, it is hard to conceive of any circumstances that would justify a permanent bar on disclosure. <u>See</u> <u>Doe v. Gonzales</u>, 449 F.3d at 422 ("A permanent ban on speech seems highly unlikely to survive the test of strict scrutiny, one where the government must show that the statute is narrowly tailored to meet a compelling government interest.") (<u>citing</u> <u>Ashcroft v. ACLU</u>, 542 U.S. at 665-66 and <u>Kamasinski</u>, 44 F.3d at 109) (Cardamone, J., concurring); <u>cf.</u> <u>Capital Cities Media, Inc. v. Toole</u>, 463 U.S.

1303, 1304-06 (1983).   Once disclosure no longer poses a
threat to national security, there is no basis for further
restricting NSL recipients from communicating their knowledge
of the government's activities.   International terrorism
investigations might generally last longer than run-of-the-
mill domestic criminal investigations, but they do not last
forever.   And, even while an investigation continues, the
disclosure regarding the issuance of a particular NSL might
not necessarily endanger that investigation.   As Judge
Cardamone wrote in his concurrence in  Doe v. Gonzales:

> The government's urging that an endless investigation
> leads logically to an endless ban on speech flies in the
> face of human knowledge and common sense: witnesses
> disappear, plans change or are completed, cases are
> closed, investigations terminate.   Further, a ban on
> speech and a shroud of secrecy in perpetuity are
> antithetical to democratic concepts and do not fit
> comfortably with the fundamental rights guaranteed
> American citizens.  Unending secrecy of actions taken by
> government officials may also serve as a cover for
> possible official misconduct and/or incompetence.

449 F.3d at 422 (Cardamone, J., concurring).

In addition to the permanent duration of the
nondisclosure order contained in the NSL, § 3511(b)(3)
provides: "If the court denies a petition for an order
modifying or setting aside a nondisclosure requirement under
this paragraph, the recipient shall be precluded for a period
of one year from filing another petition to modify or set
aside such nondisclosure requirement."   Plaintiffs argue,

correctly, that this aspect of the statue is not narrowly tailored because it may call for the period of nondisclosure to extend substantially beyond the time that national security necessitates.   For example, the statute contains no requirement that the government act affirmatively and promptly to terminate the nondisclosure order when public knowledge of the NSL no longer poses a threat to national security, or indeed, as occurred in Doe II, when the information the government seeks to maintain secret is ascertained and disclosed by third parties through legitimate means.

The Government again points to grand jury secrecy statutes and the nondisclosure requirements of related investigative tools -- wiretaps, pen registers, and administrative subpoenas -- and contends that case-by-case analysis with respect to the scope and duration of nondisclosure is not required in those contexts.   But, as discussed at length above, these contexts differ substantially from present one; in particular, they all involve prior judicial oversight and limited duration.

H.   SCOPE OF 18 U.S.C. §§ 3511(d) AND 3511(e)

In amending the NSL statute, Congress added two provisions intended to guide reviewing courts with respect to decisions to close hearings, seal documents, or review evidence ex parte and in camera.   Upon review, the Court finds

each section constitutional, provided that the attendant language as interpreted by the Court preserves the traditional role of the court in carefully examining the extent to which closure, sealing, and limited evidentiary access by the defendant is necessary.

    1.   <u>Closure of Hearings and Sealing of Records</u>

The amended statute provides that "[i]n all proceedings under this section, subject to any right to an open hearing in a contempt proceeding, the court must close any hearing to the extent necessary to prevent an unauthorized disclosure of a request for records, a report, or other information made to any person or entity under § 2709(b)." 18 U.S.C. § 3511(d). It further states that "[p]etitions, filings, records, orders, and subpoenas must ... be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a request for records." <u>Id.</u>

Plaintiffs initially challenged this provision on First Amendment grounds. They voiced concern regarding the construction of this statute, focusing on the extent to which closure and sealing was to be employed "to the extent necessary to prevent an unauthorized disclosure." <u>Id.</u> Such language, they argued, permitted the executive branch, rather than courts, to dictate whether proceedings were closed or documents sealed; they also claimed that the wording absolved

the government of compliance with the First Amendment requirement of articulating a compelling interest for either closure or sealing of public records, and failed to narrowly tailor such actions to that government interest. (See Pls.' Mem. 34.)  The Government then expressed its view that the statute permitted closure and sealing only "to the extent necessary to prevent a violation of the non-disclosure requirement" in connection with a challenge to an NSL and that the Government would be guided and limited accordingly. (See Gov't Opp. 37.)  Subsequent briefing by the parties indicated agreement on a proper interpretation of the provision, i.e., that § 3511(d) requires closure and sealing of relevant information only to the extent necessary to prevent violation of a nondisclosure provision.  Such an interpretation in no way displaces the role of the court in determining, in each instance, the extent to which documents need to be sealed or proceedings closed and does not permit the scope of such a decision to made unilaterally by the government. (See Pls.' Reply 23; Reply Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment and in Support of the Government's Motion to Dismiss or for Summary Judgment ("Gov't Reply"), dated Feb. 5, 2007, at 25.); see also Nixon v. Warner Communications, Inc., 435 U.S. 589, 599 (1978) ("[T]he decision as to access is one best left to the sound discretion

-95-

of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case."); Huminksi v. Corsones, 396 F.3d 53, 85 (2d Cir. 2005) ("[T]he district court should determine whether, under the circumstances of the case, the prejudice to the compelling interest overrides the qualified First Amendment right of access."); In re The New York Times, 828 F.2d 110, 116 (2d Cir. 1987) (noting that sealing and closure decisions are not automatic and require careful consideration by the trial court).   In that the statute, read in this light, avoids reaching constitutional right of access concerns, the Court finds this interpretation of § 3511(d) to be consistent with the First Amendment.   See Jones v. United States, 526 U.S. 227, 239 (1999); see also United States v. Gonzalez, 420 F.3d 111, 124 (2d Cir. 2005); Allstate Ins. Co. V. Serio, 261 F.3d 143, 149-50 (2d Cir. 2001).

    2.   Consideration of Ex Parte and In Camera Evidence

The statute also provides that "[i]n all proceedings under this section, the court shall, upon request of the government, review ex parte and in camera any government submission or portions thereof, which may include classified information."   18 U.S.C. § 3511(e).   In a partial resolution of Plaintiffs' challenge to this provision, both parties agreed that such language neither "requires the Court to

-96-

accord any particular weight to the government's evidence,"
nor "strip[s] the district court of its inherent authority to
determine that a matter submitted need not remain under seal."
(Gov't Opp. 47.)   Plaintiffs, however, further argue that
narrow construction of this provision is necessary to comport
with due process and would expressly include the reviewing
court's authority to, among other things, reject ex parte
evidence   if   necessary,   assess   independently   whether
information is properly classified, and craft alternatives to
mitigate the unfairness of secret evidence.  (See Pls.' Reply
28.)

At this juncture, it is sufficient to simply reiterate
that the Court's authority to assess what process is due on a
case-by-case basis is undisturbed by the language of §
3511(e).   Plaintiffs note the availability of specific
alternatives to total secrecy with respect to submission of
documents deemed classified by the government.  See United
States v. Abuhamra, 389 F.3d 309, 321 (2d Cir. 2004)
(requiring "substitute disclosure"); Naji v. Nelson, 113
F.R.D. 548, 553 (N.D. Ill. 1986) (requiring government to
disclose non-classified portions of withheld documents); Ass'n
for Reduction of Violence v. Hall, 734 F.2d 63, 68 (1st Cir.
1984) (ordering redaction or summary of privileged materials
if necessary).  The Government asserts that national security

interests will likely trump such alternatives in most cases. See Snepp v. United States, 444 U.S. 507, 509 n.3 (1980); Weberman v. NSA, 668 F.2d 676,678 (2d Cir. 1982); National Council of Resistance of Iran v. Dep't of State, 251 F.3d 192, 207 (D.C. Cir. 2001).  Neither view is entitled to unequivocal endorsement because a district court's assessment of competing interests will necessarily depend on the facts presented by each case.  See Weberman, 668 F.2d at 678 (denying plaintiff access to an in camera affidavit that may have disclosed existence of an NSA telegram intercept); Naji, 113 F.R.D. at 552 (noting, in an immigration proceeding, that ex parte evidence can only be used to decide a case on the merits in "the most extraordinary of circumstances"); In re Guantanamo Detainee Case, 344 F. Supp. 2d 174, 175 (D.D.C. 2004) (permitting review of sensitive evidence through issuance of a protective order); see also Huminksi, 396 F.3d at 85.  In that § 3511(e) neither restricts the ability of a district court to take all necessary measures required to safeguard the due process rights of a party in instances where evidence may be submitted in camera or ex parte, nor constrains the role of the district court in appropriately balancing those needs against a potentially compelling interests, this section of the statute, as written, does not violate the Fifth Amendment and remains intact.

I.    <u>SEVERANCE</u>

In <u>Doe I</u>, the Court concluded that § 2709(c), which it found facially unconstitutional, could not be severed from the remainder of the statute.  <u>See</u> 334 F. Supp. 2d at 525-26.  The Court is faced with essentially the same issue here, having found § 2709(c) facially unconstitutional.  In deciding whether a statute is severable, the Court must strive "to save as much of a statute as possible when it finds a portion of it unconstitutional," while striking down "additional provisions of a statute in the face of the unconstitutionality of particular elements of it when 'it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not.'"  <u>Id.</u> (<u>citing</u> <u>Alaska Airlines v. Brock</u>, 480 U.S. 678, 684 (1987) and <u>quoting</u> <u>Buckley v. Valeo</u>, 424 U.S. 1, 108 (1976)).  In <u>Doe I</u>, the Court concluded that "Congress intended the statute to function as a <u>secret</u> means of gathering information from communications service providers," and therefore "Congress could not have intended §§ 2709(a) and (b), the provisions authorizing the FBI to issue NSLs seeking information from wire and electronic communication service providers, to operate absent the non-disclosure provisions contained in § 2709(c)."  <u>Id.</u> (emphasis in original).  The Court finds no changes in the revisions of § 2709 that would justify a

reversal of its previous determination.  Accordingly, the Court concludes that §§ 2709(a) and (b) must be invalidated as non-severable from § 2709(c).

Finally, the Court notes that § 3511 legislates the judicial review procedures governing all NSLs, not just those issued under § 2709. See 18 U.S.C. § 3511(a), (b) (allowing judicial review by the recipient of an NSL issues under § 2709(b), "Section 626(a) or (b) of the Fair Credit Reporting Act, Section 114(a)(5)(A) of the Right Financial Privacy Act, or Section 802(a) of the National Security Act.").  Thus, some aspects of § 3511 may have a viable function even if § 2709 is struck down.  The Court acknowledges that in finding the standard of review set forth in § 3511(b) to be unconstitutional, the ruling directly implicates these other NSL statutes.  Moreover, in declaring the nondisclosure provision in § 2709(c) unconstitutional the Court recognizes that its decision indirectly implicates the constitutionality of the other NSL statutes, in so far as the Reauthorization Act provided similar nondisclosure provisions in those other NSL provisions.  Those other NSL provisions, however, are not before the Court in this case.

For this reason, the Court need not address whether § 3511(b) is severable from the rest of § 3511.  Section 3511(b) can be severed from the remainder of § 3511 "if what is left

is fully operative as a law." <u>Buckley v. Valeo</u>, 424 U.S. at 108-09.  Evaluating whether the remainder of § 3511 is capable of fully operating as a law would require an inquiry into the other NSL provisions for which § 3511 functions as the mechanism for judicial review, which the Court declines to do in this case.[23]

## IV. <u>CONCLUSION</u>

For the reasons stated above, the Court concludes that § 2709(c) is unconstitutional under the First Amendment because it functions as a licensing scheme that does not afford adequate procedural safeguards, and because it is not a sufficiently narrowly tailored restriction on protected speech.  Because the Court finds that § 2709(c) cannot be severed from the remainder of the statute, the Court finds the entirety of § 2709 unconstitutional.  Additionally, the Court concludes that § 3511(b) is unconstitutional under the First Amendment and the doctrine of separation of powers.

## V. <u>STAY OF JUDGMENT</u>

As it did in <u>Doe I</u>, in light of the implications of its ruling and the importance of the issues involved, the Court

---

[23]  The Court notes that § 3511(a), which addresses challenges to the underlying NSL, states that a court "may modify or set aside the request if compliance would be unreasonable, oppressive, or otherwise unlawful." 18 U.S.C. § 3511(a).  This provision is certainly capable of being read, in the absence of § 3511(b), to include requests to modify or set-aside any nondisclosure requirements imposed by other NSL statutes if the nondisclosure requirement is found to be unlawful, in which case the remainder of § 3511 is at least capable of fully operating as a law.

will stay enforcement of its judgment pending appeal, or for the Government otherwise to pursue any alternate course of action, for 90 days.  The stay is intended to give the Government the opportunity to move this Court, or the Court of Appeals, for whatever appropriate relief it may seek to maintain the confidentiality of any information implicated by the Court's ruling.

## VI. <u>ORDER</u>

For the reasons discussed above, it is hereby

**ORDERED** that the motion of John Doe, the American Civil Liberties Union, and the American Civil Liberties Union Foundation (collectively, "Plaintiffs") for summary judgment in this case is GRANTED in part and DENIED in part. Defendants Alberto Gonzales, in his official capacity as Attorney General of the United States, Robert Mueller, in his official capacity as Director of the Federal Bureau of Investigation, and Valerie E. Caproni, in her official capacity as General Counsel to the Federal Bureau of Investigation (collectively "Defendants"), are hereby enjoined from issuing national security letters under 18 U.S.C. § 2709, or from enforcing the provisions of 18 U.S.C. § 2709(c) and 18 U.S.C. §3511(b); it is further

**ORDERED** that Defendants' motion to dismiss, or in the alternative, for summary judgment, is DENIED; it is further

**ORDERED** that the Clerk of Court shall file this Decision and Order on the public docket; and is finally

**ORDERED** that the Clerk of Court shall enter judgment accordingly but stay enforcement of the judgment pending any appeal, or, if no appeal is filed, for 90 days from the date of this Order.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated:      New York, New York
            6 September 2007

                                        Victor Marrero
                                          U.S.D.J.

-103-